RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0115P (6th Cir.)
File Name: 02a0115p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

EUGENE TERRANCE, as
Personal Representative of the
Estate of Everett L. Terrance,
          *Plaintiff-Appellant,*

                                    No. 00-1971

          *v.*

NORTHVILLE REGIONAL
PSYCHIATRIC HOSPITAL, et
al.,
          *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-74433—Lawrence P. Zatkoff, Chief District Judge.

Argued: October 25, 2001

Decided and Filed: April 8, 2002

Before: JONES[*] and CLAY, Circuit Judges; DOWD,
District Judge.[**]

---

[*] This opinion was submitted to the court prior to Judge Nathaniel R. Jones' departure from the court effective March 31, 2002.

[**] The Honorable David A. Dowd, United States District Judge for the Northern District of Ohio, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:**   Jeremiah J. Kenney, FIEGER, FIEGER, SCHWARTZ & KENNEY, Southfield, Michigan, for Appellant.   Mark S. Meadows, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:**   Tammy J. Reiss, FIEGER, FIEGER, SCHWARTZ & KENNEY, Southfield, Michigan, for Appellant.   Mark S. Meadows, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

_____

**OPINION**

_____

NATHANIEL R. JONES, Circuit Judge.  Plaintiff Eugene Terrance ("Terrance"), father of Everett Terrance ("the decedent") and the personal representative of his estate, appeals the district court's order granting summary judgment in favor of defendants, Northville Regional Psychiatric Hospital ("NRPH"), the State of Michigan Department of Mental Health, and the named defendants, in a 42 U.S.C. §1983 action claiming deliberate indifference to medical needs and lack of due process in violation of the decedent's rights under the Eighth and Fourteenth Amendments.  The district court held that no genuine issue of material fact existed as to whether the defendants were deliberately indifferent to the decedent's medical needs.  The court did not address the due process claim.  On appeal, plaintiff argues that the award of summary judgment was in error.  For the reasons stated below, we AFFIRM the district court as to certain defendants on the Eighth Amendment claim, but REVERSE the district court's grant of summary judgment as to other defendants on the Eighth Amendment claim and as to all defendants on the Fourteenth Amendment claim, and REMAND for further proceedings consistent with this opinion.

## I. FACTS

On June 19, 1995, Everett Terrance was involuntarily committed to NRPH to receive treatment for auditory hallucinations, depression, erratic mood swings, and paranoid delusions. When the decedent arrived at NRPH, he was housed in a room located directly above a main steam line. Starting in June 1995, NRPH underwent an asbestos abatement program during which asbestos pipe insulation was removed from the steam line and later replaced with fiberglass insulation. The exposure of the bare pipe caused more heat to emanate until the new insulation was applied.

During his hospitalization at NRPH, the decedent was treated by several medical professionals. Staff psychiatrist Dr. O.R. Lee was the decedent's primary psychiatrist. Dr. Govindan Sadasivan covered the decedent's unit while Dr. Lee was on vacation. The decedent was also treated by Dr. Ardeshir Said, who was the primary internist responsible for overseeing all of the decedent's medical problems on an "as needed" basis. Dr. Said treated and had more contact with the decedent than any other physician at NRPH. The decedent was also treated by primary therapist Nurse Sherley Owens and occupational therapist Barbara Fanning. During the decedent's stay in the facility, Dr. Mehdi Almasi served as Medical Director and, as such, was responsible for drafting all of NRPH's policies and procedures.

While at NRPH, the decedent suffered from a number of medical conditions. He received a variety of treatments for psychological illness, including the administration of psychotropic medications, such as Haldol, Cogentin, and Lithium. These medications can cause hyperthermia, dehydration, heat exhaustion, and heat stroke. The decedent also suffered from pre-existing heart conditions, including hypertension and diabetes. On June 23, 1995, Nurse Owens developed a "Comprehensive Nursing Assessment" for the decedent in which she concluded that he had problems following directions and thus required staff supervision in off-

ward activities. Because of the decedent's conditions and his inability to follow directions, he was kept under staff supervision during off-ward activities.

On June 27, 1995, at the direction of the medical staff, the decedent began participating in centralized activities ("CAT") in the mornings and work therapy in the afternoons. On July 6, 1995, the decedent wandered off from CAT, but was apprehended by security and returned to the ward several hours later. The decedent was then placed on "escape alert."[1] Dr. Sadasivan discontinued the escape alert on July 10 after the decedent told the doctor that he did not feel like escaping. Of particular note here is that, according to hospital records, the only air conditioning unit within the ward was not working on July 10 and was not repaired until one week later.

On July 11, the decedent told Nurse Owens that he wanted to return to the CAT program. Nurse Owens determined that the decedent should not leave the ward until July 17. On July 12, the decedent complained of feeling weak. Consequently, Dr. Said ordered tests to be run on the decedent. The tests showed no signs of hyperglycemia.[2] Despite Nurse Owens's order, the decedent participated in outdoor activity for four hours on the afternoon of July 12. The next day, the decedent was "returned to the ward complaining of chest pain." The decedent's blood pressure was elevated and his EKG was interpreted as abnormal. Despite these results, Dr. Said's medical plan for the decedent indicated that no action needed. Dr. Said later noted that the decedent's diabetes was uncontrolled, but Dr. Said took no measures to control the decedent's glucose level at that time.

---

[1] "Escape alert" is a hospital protocol calling for intense supervision, prohibiting off-ward activity, and requiring observations of the patient's whereabouts every 15 minutes.

[2] "Hyperglycemia" is the physical condition of having an abnormally high concentration of glucose (blood sugar) in the circulating blood. STEDMAN'S MEDICAL DICTIONARY 770 (25th ed. 1990).

In the instant case, the decedent was involuntarily committed. The lower court should have considered the defendants' duty to provide reasonable safety for the decedent under a heightened Fourteenth Amendment standard. Under this legal standard, there clearly was a genuine issue of material fact with regard to some of the defendants which could lead a rational fact finder to find in Terrance's favor: whether the actions and inactions of the named defendants were based upon accepted professional judgment. The facts in this case could likely support a finding that one or more defendants committed a substantial departure from accepted professional judgment. Thus, the district court's grant of summary judgment in defendants' favor was erroneous. Accordingly, we find that is necessary upon remand for the district court to conduct a trial on plaintiff's claims against *each* named defendant under the Fourteenth Amendment standard as outlined in this opinion as the lower court has not yet considered the decedent's due process rights under this standard.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the grant of summary judgment as to defendants Dr, Pan, Dr. Nair, Sr. Kim, Dr. Almasi, Ms. Fanning, the Michigan Department of Health, and NRPH on the Eighth Amendment claim, but **REVERSE** the district court's decision as to defendants Dr. Said, Dr. Lee, Dr. Sadasivan, and Nurse Owens on the Eighth Amendment claim and as to all defendants on the Fourteenth Amendment claim, and **REMAND** this case for further proceedings consistent with this opinion.

has considerable discretion in determining the nature and scope of its responsibilities, it is also charged with adhering to professional norms of conduct. *Id.* at 317, 323-24. Moreover, where hospital staff admittedly fail to follow institutional policies and procedures, questions about the State's adherence to accepted professional conduct are not unwarranted.

The decedent's personal safety was entrusted to NRPH and its staff. Yet, the decedent met his demise while committed to NRPH. Here, numerous questions about the decedent's safety and NRPH staff's actions abound. First, would a reasonable medical professional in this situation have allowed a mental health patient known to have heightened sensitivity to heat stroke be placed in a location with the potential for high temperatures? Additionally, would a reasonable medical professional have allowed such a patient to wander off on an extremely hot day when the patient was ordered to stay indoors? Finally, would a reasonable medical professional take an hour to respond to a medical emergency involving a patient known to have numerous serious medical conditions without any explanation for the delay?

These factual issues have not been clarified in this case because the district court failed to consider this case under the Fourteenth Amendment standard.[5] We decline to make such factual determinations as this is well beyond the realm of this court's authority. However, we believe that it is essential that such factual determinations are made in accord with appropriate legal standards.

---

[5]Count 3 of the appellant's Second Amended Complaint, at ¶ 68, described the conduct of the individual defendants as amounting to a deliberate indifference to plaintiff's decedent's serious medical needs. Moreover, the Second Amended Complaint alleged neither an Eighth nor a Fourteenth Amendment claim. However, in responding to the defendants' motion for summary judgment, the plaintiff did inferentially advance the Fourteenth Amendment claim by citing *Youngber v. Romeo*, 457 U.S. 307 (1982).

According to hospital records, between July 15 and July 17, the decedent drank a lot of water, was confused, and became agitated to the point of being non-responsive. The decedent was also observed talking to himself and responding to voices. On July 17, Dr. Lee increased the decedent's dosage of Haldol. On July 18, the staff observed the decedent drinking excessive amounts of water and was therefore kept under close observation because the staff suspected that the decedent was dehydrated.

Two days later, Dr. Lee ordered an additional daily injection of Haldol, thus increasing again the decedent's total daily dosage of the drug. At this time, Dr. Lee issued a plan to observe the decedent for risk of dehydration.

On July 25, the decedent complained to Nurse Owens that his medicine was causing him to sweat profusely and suffer stiffness. The decedent was given Cogentin to counteract stiffness and hand tremors, which are side effects of Haldol. Regarding the pipe repairs, on the same day, the maintenance personnel were installing insulation to the elbows of the bare steam pipes directly below the decedent's room, causing additional heat to emanate from the pipes into the ward above.

On July 27, Nurse Owens recorded no further complaints of reactions by the decedent and also noted the decedent began to participate in activities with staff, including occasional van rides with Ms. Fanning. On July 29, Nurse Owens noted her intention to refer the decedent back to CAT and into the centralized therapy program ("CTP") the following week.

On July 31, the temperature outside was 95 degrees Fahrenheit and the humidity level was above 90 percent. NRPH's temperature chart, which was distributed to hospital employees during the summer months, indicated that these conditions produced a heat index of 148 degrees. According to NRPH advisory guidelines, the decedent was the type of patient who should have been in a cool room and not permitted to go outdoors or to engage in strenuous activity.

At 6:30 a.m. on the morning of July 31, the decedent complained of dry mouth. Nevertheless, some three hours later, Dr. Lee determined that the decedent should resume participation in more outdoor activities. At approximately 10:00 a.m., Dr. Said saw the decedent and realized that the decedent had not received his blood pressure medication over the weekend because the nurses apparently forgot to remind Dr. Said to renew the order. After two elevated blood pressure readings were obtained from the decedent, Dr. Said doubled the decedent's medication to compensate for the days that the decedent had gone without blood pressure medication. However, Dr. Said's order for this dosage was never carried out.

On that same day, no one at NRPH knew of the decedent's whereabouts from the time he was seen with Dr. Said in the morning until about 1:30 p.m. that afternoon, when the decedent was seen staggering in the hallway near the nursing station. Dr. Lee and Ms. Fanning assisted the decedent into a treatment room and observed that the decedent was sweating, hot to the touch, and complaining that he did not feel well. Dr. Lee thought that the decedent was suffering from heat stroke and needed immediate treatment, but had to consult with Dr. Said before prescribing treatment.

Dr. Lee instructed Nurse Owens to page Dr. Said "STAT."[3] At approximately 1:30 p.m., Nurse Owens paged Dr. Said and explained that the decedent was sweaty, confused, had a temperature of 103.5 degrees, and was restless to the point of being uncooperative. Nurse Owens also informed Dr. Said that the decedent had been outside. Dr. Said told Nurse Owens that he was on his way to the ward where the decedent was located.

---

[3] "STAT" is a common medical abbreviation which is used to imply urgent or rush. It is derived from a Latin word *statim* which means immediately. STEDMAN'S MEDICAL DICTIONARY 1330 (23rd ed. 1976).

liberties" that can be limited only by an "overriding, non-punitive" state interest. *Id*. at 157-58 (footnote omitted). The Supreme Court vacated the Third Circuit's decision because it concluded that the jury was erroneously instructed on the appropriate standard of liability. *Youngberg*, 457 U.S. at 325. The Court stated that the appropriate question for the jury was not simply whether the decedent's liberty interest was infringed. *Id*. at 320. Rather, the lower court should have charged the jury to determine whether the lack of absolute safety violated the decedent's substantive due process rights. *Id*.

In order to determine "whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" *Id*. (citing *Poe v. Ullman*, 367 U.S. 497, 542, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961) (Harlan, J., dissenting)). In order to ascertain whether a state has adequately protected the rights of an involuntarily committed mental patient, "the Constitution only requires that courts make certain that professional judgment in fact was exercised." *Youngberg*, 457 U.S. at 321. In making such determinations, decisions made by the appropriate professional are entitled to a presumption of correctness unless it is established that the person responsible did not base the decision on accepted professional judgment. *Id*. at 323. Throughout this analysis, courts must acknowledge that a heightened degree of protection must be afforded to the involuntarily committed. *See id*. at 321-22.

## 2.  Application of Fourteenth Amendment standard to defendants

Here, as in *Youngberg*, the respective due process interests of the decedent and NRPH should have been balanced. While NRPH has an interest in running an administratively efficient institution, such an interest should not be allowed to trump the constitutional rights of the involuntarily committed who are institutionalized for their own safety. Although the State

heightened protection afforded to the decedent under the Fourteenth Amendment. Specifically, in its analysis, the lower court did not consider the decedent's heightened constitutional protection under *Youngberg.*

The mere fact that the decedent was involuntarily committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment. *See Vitek v. Jones*, 445 U.S. 480, 494, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980) ("the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections"). The liberty interest that one retains is not, however, absolute. *Youngberg*, 457 U.S. at 319-20.

This issue here is governed largely by *Youngberg* because the facts in this case are similar in key respects to the *Youngberg* case. Like the decedent here, the respondent in *Youngberg* was involuntarily committed to a mental health facility "to [obtain] reasonable care and safety, conditions not available to him outside of an institution." *Id.* at 321, n. 27. The respondent brought a substantive due process claim against the institution, alleging that his constitutional right to safe conditions of confinement had been violated. The district court held that the Eighth Amendment was the proper standard for determining the rights of the involuntarily committed. *Id.* at 312. The Third Circuit, sitting en banc, reversed and remanded for a new trial. *Romeo v. Youngberg*, 644 F.2d 147, 172 (3d Cir. 1980) (en banc), *vacated*, 457 U.S. 307 (1982). The en banc court determined that the Fourteenth Amendment and the liberty interest protected by that Amendment provide the proper constitutional basis for those rights. *Id* at 157. In applying the Fourteenth Amendment, the court found that the involuntarily committed retain liberty interests in freedom of movement and in personal security. *Id.* The court concluded that these rights are "fundamental

At this time, the decedent's blood pressure was elevated, and his mental state was deteriorating quickly. Dr. Lee and Nurse Owens waited approximately one hour before calling a medical emergency at 2:27 p.m. Dr. Said arrived at 2:30 p.m. Drs. Regina Pan, Ramachandran Nair, and Kijoon Kim responded to the emergency call soon thereafter, but did not provide any direct care to the decedent because Drs. Said and Almasi had already begun treating the decedent.

Upon his arrival, Dr. Said told the doctors to remove the decedent's clothing. While the doctors were removing his clothing, the decedent lost consciousness. Dr. Lee inserted an IV and placed wet towels over the decedent's body. Dr. Lee wanted to administer an ice water enema, but there was no enema equipment or ice water on the ward. Dr. Lee also requested a rectal thermometer but there was no rectal thermometer available on the ward. In addition, Dantrolene, a drug used to treat hyperthermia induced by psychotropic medications, was also requested by Dr. Lee, but the drug was not available within the hospital.

At 2:32 p.m., Emergency Medical Services ("EMS") was called by one of the doctors who was treating the decedent. EMS arrived at 2:41 p.m. and began resuscitation efforts, which were unsuccessful. EMS then transferred the decedent to St. Mary's Hospital, where resuscitation measures continued. The decedent died at approximately 3:20 p.m. The official cause of death was listed as acute cardiopulmonary arrest and hyperthermia exacerbated by Haldol and Benzotropine.

On June 13, 1997, Terrance, the decedent's father and personal representative of the decedent's estate, filed suit in the Wayne County (Michigan) Circuit Court, alleging medical malpractice, negligence, gross negligence, and wanton misconduct against all defendants ("Count I") and negligence and gross negligence against defendants NRPH and the State of Michigan Department of Mental Health ("Count II"). On September 1, 1999, plaintiff amended his Complaint in the

Wayne County suit to include a violation of the decedent's civil rights under 42 U.S.C. § 1983, claiming violations of the decedent's Eighth and Fourteenth Amendment rights on the grounds that the defendants acted with deliberate indifference to the decedent's serious medical needs and violated the decedent's right to due process ("Count III").

On September 13, 1999, defendants removed the action to the United States District Court for the Eastern District of Michigan.[4]    The district court noted that it had original jurisdiction over Count III and supplemental jurisdiction over the state law claims in Counts I and II.  (J.A. at 37).  However, the district court found that "the contemporaneous presentation of plaintiff's parallel state law claims for relief [with the federal civil rights claim would] result in the undue confusion of the jury." *Id.*  The district court thus remanded Counts I and II to the Wayne County Circuit Court, but retained jurisdiction over Count III. *Id.*

On April 3, 2000, defendants moved for summary judgment, alleging that there was no genuine issue of material fact to be decided and arguing that plaintiff's case did not demonstrate a constitutional violation.  In the alternative, defendants asserted the defense of qualified immunity.  The district court analyzed defendants' actions under a heightened standard for deliberate indifference.  The court found that defendants did not know of nor disregard an excessive risk to the decedent's health and safety.  Consequently, on the Eighth Amendment claim, the court held that the named defendants did not act deliberately indifferent in supervising and treating the decedent, and were therefore entitled to qualified immunity.  Moreover, the court held that NRPH and the Michigan Department of Mental Health could not be held liable under the doctrine of *respondeat superior*. Accordingly, the district court granted defendants' motion.

---

[4]Defendant Dr. H. Blanda was dismissed from the action prior to removal and is no longer involved in this dispute.

judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

  …

[Furthermore, under the Fourteenth Amendment,] [t]he state also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution.

*Id.* at 323-24.

In the present case, Terrance asserts that each individually named defendant committed a substantial departure from accepted professional treatment.  For example, Terrance argues that Dr. Said did not respond to the decedent's medical emergency in a timely fashion, and thus substantially departed from accepted professional treatment. Terrance claims that Dr. Lee substantially departed from accepted professional treatment because she increased the decedent's medication despite the decedent's dehydration, allowed the decedent to participate in outdoor activities, and failed to seek alternate assistance in light of Dr. Said's delayed response to the decedent's medical emergency.  Terrance also claims that Nurse Owens made a substantial departure from accepted professional treatment because she did not equip Ward C with ice, enema equipment, and a rectal thermometer, and failed to seek alternate assistance in light of Dr. Said's untimely response to the decedent's medical emergency.  Finally, Terrance argues that Dr. Almasi made a substantial departure because he did not institute policies and procedures to prevent the decedent's death.

The district court held that defendants' individual actions did not constitute violations of the decedent's due process rights. The lower court reasoned that Terrance failed to demonstrate that defendants treated the decedent inappropriately or did less than their training indicated was necessary. However, the district court failed to consider the

erroneous. Accordingly, we remand with instructions to send the plaintiff's claims against Dr. Said, Dr. Lee, Dr. Sadasivan and Nurse Owens to trial to determine whether any of these defendants had a deliberate indifference to the decedent's serious medical needs under the "grossly inadequate care" standard.

Accordingly, under the facts of this case, we find that the conduct of Dr. Pan, Dr. Nair, Dr. Kim, Dr. Almasi, Ms. Fanning, the Michigan Department of Mental Health, and NRPH does not support a finding of deliberate indifference. Accordingly, we affirm the district court's order of summary judgment in favor of these defendants on the Eighth Amendment claim.

## D.  Fourteenth Amendment

### 1.  Due process violation

The Due Process Clause of the Fourteenth Amendment affords incarcerated individuals the right to adequate food, shelter, clothing and medical care. *Youngberg v. Romeo*, 457 U.S. 307*, 315, 102 S. Ct. 2452, 73 L.Ed. 2d 28 (1982)*. The involuntarily committed have greater rights regarding confinement under the Fourteenth Amendment than criminals are due under the Eighth Amendment. "Persons who have been involuntarily committed are entitled to more considerate treatment in conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321-22. Such persons have a claim to safe conditions inasmuch as the Supreme Court has stated that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed - who may not be punished at all - in unsafe conditions."*Id.* at 315-16. The Court held that an individual may impose civil liability against professionals violating such rights:

> when the decision by the professional is such a substantial departure from accepted professional

The court did not address the Fourteenth Amendment due process claim. Terrance now appeals the district court's order.

## II.  DISCUSSION

### A.  Summary Judgment

This court reviews an order granting summary judgment *de novo*. *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Terry Barr*, 96 F.3d at 178. No genuine issue for trial exists when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Moreover, this court must review the record, and any inferences derived therefrom, in the light most favorable to the non-moving party. *Id.* Accordingly, "when the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept the evidence as true." *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994).

### B.  Plaintiff' s claims on appeal

Terrance appeals the district court's order awarding summary judgment in favor of defendants in this 42 U.S.C. § 1983 action. He asserts that defendants violated the decedent's Eighth Amendment right to medical care because defendants acted with deliberate indifference in their treatment and care of the decedent that led directly to his death. Specifically, Terrance argues that defendants' conduct reflected substantial departure from accepted professional treatment and did not respond to the decedent's medical emergency in a timely fashion. Additionally, he asserts that

the decedent's Fourteenth Amendment right to due process was violated because the defendants violated the decedent's right to be treated in a facility with safe conditions. Moreover, Terrance contends that the decedent should have been afforded more considerate treatment because he was involuntarily committed to the defendant facility.

Under 42 U.S.C. § 1983, state actors are prohibited from violating the civil rights of others. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. This court has consistently held that damage claims against governmental officials alleged to arise from violations of constitutional rights cannot be founded upon conclusory, vague or general allegations, but must instead, allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what *each* defendant did to violate the asserted right. *See, e.g., Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986). This court has adopted the requirement that a plaintiff allege "with particularity" all material facts to be relied upon when asserting that a governmental official has violated a constitutional right. *Elliott v. Perez*, 751 F.2d 1472, 1483 (6th Cir. 1985); s*ee also Dominique v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987).

### H. Michigan Department of Mental Health and NRPH

Finally, the Michigan Department of Mental Health's role as operator of NRPH and NRPH's role as health care provider does not subject either to liability under the doctrine of *respondeat superior* in the absence of some evidence of a policy or custom that would subject these employers to § 1983 liability under the facts of the case now before us. *Monell v. Dept. of Social Serv.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 211 (1978). Under these facts, there is no material issue of fact as to whether either of these defendants had such a policy and were therefore deliberately indifferent to the decedent's serious medical needs.

In light of the foregoing, plaintiff has presented sufficient evidence to establish a question of fact regarding whether one or more defendants were deliberately indifferent to the decedent's serious medical needs. The district court analyzed this case under a higher than warranted standard for deliberate indifference. The district court concluded that the individual defendants did respond to the decedent's medical needs, and that, although each defendant's individual response may not have been immediate, the district court found that plaintiff failed to advance facts to support a showing of deliberate indifference. The district court determined that defendants' responses and attempts to treat the decedent foreclosed the possibility of deliberate indifference on defendants' part.

The district court's analysis ignores the lower "grossly inadequate care" standard for finding deliberate indifference to serious medical needs. J.A. at 28-32. Under this standard, it is probable that a jury could conclude that reasonable medical professionals in Dr. Said, Dr. Lee, Dr. Sadasivan, and Nurse Owens' positions would have concluded that there was a substantial risk to the decedent's safety, and that these defendants exhibited a deliberate indifference in treating and caring for the decedent which directly led to his death. Thus, the district court's grant of summary judgment in favor of Dr. Said, Dr. Lee, Dr. Sadasivan, and Nurse Owens was

Owens' position, would have concluded that a substantial risk of serious harm to the decedent existed.

### E.  The EMS team

In contrast to the above defendants, plaintiff has failed to allege "with particularity" sufficient material facts to support a finding that Dr. Pan, Dr. Nair or Dr. Kim acted with deliberate indifference under the "grossly inadequate care" standard.  Dr. Pan, Dr. Nair and Dr. Kim did not provide direct treatment to the decedent because Dr. Said and Dr. Almasi had already begun treating the decedent before the emergency treatment team arrived.  Each of these defendants' involvement with the decedent does not support a finding of deliberate indifference towards the decedent. In the present case, there is no material issue of fact as to whether any of these defendants were deliberately indifferent to the decedent's serious medical needs.

### F.  Dr. Almasi

Similarly, plaintiff has failed to allege sufficient material facts to support a finding that Dr. Almasi was deliberately indifferent to the decedent's serious medical needs under the "grossly inadequate care" standard.  Without more, Dr. Almasi's role as medical director and drafter of NRPH's policies is insufficient to subject him to individual liability under the facts of this case.  There is no material issue of fact as to whether Dr. Almasi was dliberately indifferent to the decedent's serious medical needs.

### G.  Ms. Fanning

Like Dr. Almasi, Ms.  Fanning's actions in her capacity as the decedent's occupational therapist, viewed in a light most favorable to the plaintiff, likewise does not subject her to individual liability.  We find that no material issue of fact exists as to whether Ms. Fanning was deliberately indifferent to the decedent's serious medical needs.

The key issue in this case is whether summary judgment was appropriate.   First, we consider whether defendants' active and passive treatment of the decedent violated his rights regarding medical care under the Eighth Amendment. Additionally, because the decedent was involuntarily committed to NRPH for psychiatric care and treatment, we must consider the substantive due process rights of involuntarily committed persons under the Fourteenth Amendment. We find that a jury could reasonably conclude that one or more of the defendants violated the decedent's constitutional rights in this case, and therefore, summary judgment in favor of all defendants was inappropriate.

### C.  Eighth Amendment

### 1.   Deliberate Indifference Standard

The Eighth Amendment to the Constitution prohibits the infliction of cruel and unusual punishment. U.S. CONST. amend VIII.  The "cruel and unusual punishment" provision is invoked here as it applies to prisoners.  As the decedent was involuntarily committed to NRPH for psychiatric treatment, he was  similarly situated to a prisoner with regard to the Eighth Amendment right to medical care.  This court has held that the legal standard for asserting an Eighth Amendment claim regarding medical care for prisoners is "deliberate indifference." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc).

It is well settled that the "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'. . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)). However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105. "[A] complaint that a physician has been negligent in diagnosing or treating

a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence *deliberate indifference* to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* (emphasis added).

In *Estelle,* the Supreme Court established the "deliberate indifference" standard. The Court further clarified the meaning of that term in *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994), a decision regarding prison officials' duty to protect inmates from violence at the hands of other inmates. In *Farmer,* the Court held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. However, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that a harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. Further, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

The federal courts have also held that less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases. For example, the Eleventh Circuit has held that "deliberate indifference may be established by a

medical needs as a jury could possibly decide that a reasonable doctor, in Dr. Sadasivan's position, would have concluded that a substantial risk of serious harm to the decedent existed.

### D. Nurse Owens

There is also an existing issue of fact regarding whether Nurse Owens' actions towards the decedent constitute a finding of deliberate indifference, when analyzed under the "grossly inadequate care." Like the aforementioned defendants, Nurse Owens was also aware of the numerous health risks confronting the decedent, including his obesity, diabetes, hypertension and increased risk of heat stroke. She also knew that the decedent needed supervision when he left the ward. Moreover, Nurse Owens was also aware of the extreme heat and humidity on the day of the decedent's death. Despite her knowledge of this information, Nurse Owens referred the decedent to off-ward activities without supervision, on an unusually hot and humid day and in direct contravention to NRPH's own policy. As a result of Nurse Owens' careless actions, the decedent was permitted to go outdoors unsupervised, over-exert himself, and collapsed after being outside in the extreme heat.

Additionally, Nurse Owens' took other actions with regard to the decedent's serious medical needs. Despite her knowledge of the decedent's susceptibility to heat stroke, Nurse Owens failed to equip the decedent's ward with proper medical equipment, such as ice, an ice water enema, and a rectal thermometer. In addition, Nurse Owens, acting together with Dr. Lee, failed to immediately seek alternate medical assistance in light of Dr. Said's delayed response to the STAT page. Nurse Owens' delayed response also cost the decedent time, during which he could have received medical care which might have saved his life. Taken in the aggregate, Nurse Owens' actions could constitute a finding of deliberate indifference to the decedent's serious medical needs because a jury could possibly decide that a reasonable nurse, in Nurse

and collapse as a result of his exposure to the abnormally hot environment.  When Dr. Lee discovered the decedent stumbling down the hallway at 1:30 p.m., she immediately suspected hyperthermia but waited almost an hour for Dr. Said to arrive on the ward before providing the necessary medical treatment.  As such, although she knew about the decedent's serious medical condition, Dr. Lee chose to wait for Dr. Said instead of immediately contacting another physician or the emergency team.  Dr. Lee's delayed action also cost the decedent invaluable time, during which he could have received medical care which may have saved his life. Collectively, Dr. Lee's actions could constitute a finding of deliberate indifference to the decedent's serious medical needs because a jury could possibly decide that a reasonable doctor, in Dr. Lee's position, would have concluded that a substantial risk of serious harm to the decedent existed.

### C. Dr. Sadasivan

Similar to Drs. Said and Lee, an analysis of this case under the "grossly inadequate care" standard raises a factual question regarding whether Dr. Sadasivan acted with a deliberate indifference to the decedent's serious medical needs. Dr. Sadasivan was aware of the risk of the decedent's escape. Dr. Sadasivan knew that the decedent had wandered off from CAT, was apprehended and returned by security, and was subsequently put on escape alert. Despite his knowledge of the decedent's escape risk, Dr. Sadasivan discontinued the escape alert just four days later based upon the decedent's statement that he did not feel like escaping. As a result of Dr. Sadasivan's discontinuance of the escape alert, the decedent did not receive the close supervision that he needed, was permitted to leave the ward, and was exposed to the extreme weather conditions.  Dr. Sadasivan's inconsiderate action deprived the decedent of the close supervision that he needed to ensure his own safety and well-being, which may have prevented the decedent from going outdoors in the extreme heat.  Collectively, Dr. Sadasivan's actions could constitute a finding of deliberate indifference to the decedent's serious

showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment." *McElligott v. Foley*, 182 F.3d 1248, 1255) (11th Cir. 1999) (a doctor's awareness that plaintiff's condition was deteriorating and subsequent failure to treat plaintiff could support a finding of deliberate indifference); *see Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) (a doctor's decisions to remove patient from medication and to restore the medication without Lithium constitutes deliberate indifference to patient's psychiatric condition).  Moreover, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (a physician's assistant's failure to inform his superior or a medical doctor of a prisoner's known injured leg constitutes deliberate indifference); *Cooper v. Dyke*, 814 F.2d 941, 945-46 (4th Cir. 1987) (a prison employee's two-hour delay in providing medical care to an inmate known to have gunshot wounds constitutes deliberate indifference).

Our consideration of whether defendants acted with deliberate indifference to the decedent's serious medical needs is guided by the Eleventh Circuit's holding in *Waldrop*. In *Waldrop,* the parents of a state prison inmate brought suit against prison medical personnel under 42 U.S.C. § 1983, alleging that the prison officials provided grossly inadequate medical care and were thus deliberately indifferent to the inmate's psychiatric needs in violation of the Eighth Amendment.  In its analysis, the Eleventh Circuit described grossly inadequate medical care as medical treatment "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Waldrop*, 871 F.2d at 1033 (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)).  The court stated that the relevant inquiry as to whether the defendants provided grossly inadequate care was "whether a reasonable doctor . . . could have concluded his actions were lawful." *Id.* at 1034.  In *Waldrop*, the court affirmed the denial of defendants' motion for summary judgment in a § 1983 action finding that a

particularized, fact-specific inquiry was a necessity to the proper analysis of plaintiff's claim. Here, as in that case, the proper analysis of Terrance's claim requires a similar inquiry.

**2. Application of Eighth Amendment standard to defendants**

In the instant case, there are several issues of fact as to whether some defendants were deliberately indifferent to the decedent's serious medical needs. Each defendant is addressed below.

**A. Dr. Said**

Although we find that plaintiff has failed to state a § 1983 claim as to all defendants, an analysis of this case under the "grossly inadequate care" standard raises a factual question regarding whether Dr. Said acted with a deliberate indifference to the decedent's serious medical needs. Dr. Said was aware of the numerous health risks confronting the decedent. He knew that the decedent was an obese diabetic suffering from hypertension and a heart condition with abnormal EKG readings. In addition, he was also aware that the decedent was on medication which placed him at an increased risk for heat stroke. Moreover, Dr. Said also knew that the weather on July 31, 1995 was extremely hot and humid. Despite this information and his knowledge of seven or eight prior non-fatal hyperthermia cases at NRPH, as well as the decedent's susceptibility to heat stroke, Dr. Said failed to follow NRPH's protocol and write an order restricting the decedent to stay within a cool area on the day of his collapse and subsequent demise. As a result of Dr. Said's failure to follow hospital protocol, the decedent went outdoors, over-exerted himself, and collapsed due to the extreme weather conditions.

Dr. Said's conduct regarding the decedent's serious medical needs is not, however, limited to his knowledge and inaction regarding the decedent's medical conditions. Despite being paged STAT by the medical staff at 1:30 p.m. and despite his

knowledge of the decedent's numerous health risks, Dr. Said did not arrive at the hospital until approximately one hour after being paged by the NRPH staff, without providing any explanation of his whereabouts. Dr. Said's delayed response cost the decedent precious time, during which he could have received medical treatment which may have saved his life. Taken in the aggregate, Dr. Said's actions could constitute a finding of deliberate indifference to the decedent's serious medical needs because a jury could possibly decide that a reasonable doctor, in Dr. Said's position, would have concluded that a substantial risk of serious harm to the decedent existed.

**B. Dr. Lee**

Additionally, an analysis of this case under the "grossly inadequate care" standard raises a factual question regarding whether Dr. Lee acted with a deliberate indifference to the decedent's serious medical needs. Like Dr. Said, Dr. Lee was also aware of the numerous health risks confronting the decedent, and knew that the decedent was an obese diabetic suffering from hypertension and a heart condition with abnormal EKG readings. Moreover, Dr. Lee was aware that the ward on which the decedent was located was unusually hot during the summer and knew that the heat became a health danger to patients. In addition, she was also aware that the decedent was on medication which placed him at an increased risk for heat stroke. Despite this information and the decedent's dehydration symptoms, Dr. Lee continued to prescribe increasing amounts of psychotropic drugs to the decedent, although she knew that the drugs caused drug-induced hyperthermia.

Furthermore, on July 31, 1995, Dr. Lee wanted all NRPH patients to stay indoors. Nevertheless, those patients with activity cards, including the decedent, were permitted to go outside that day. As a result of Dr. Lee's disregard of the decedent's susceptibility to extreme temperature conditions, the decedent was allowed to go outdoors, over-exert himself,