Alfred R. SCICLUNA, Plaintiff,

v.

Harry G. WELLS, et al.

No. 99–CV–70376.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 20, 2002.

Nedra D. Campbell, Miller Cohen, Deborah A. Bonner, Detroit, MI, for Plaintiff.

John L. Thurber, Michigan Dept. of Attorney General, Corrections Division, Lansing, MI, for Defendants.

**MEMORANDUM AND ORDER GRANTING DEFENDANTS STRAUB, and BORGERT'S MOTIONS FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT HARVEY'S MOTION FOR SUMMARY JUDGMENT**

COHN, District Judge.

## I. *Introduction*

This is a civil rights case under 42 U.S.C. § 1983 with pendent state claims. Plaintiff Alfred Scicluna (Scicluna) sued various Michigan prison officials, including: Harry G. Wells (Wells), Warden (now deceased), Dennis Straub (Straub), Deputy Warden, Gene Borgert (Borgert), Warden, Felix Carrizales (Carrizales), a Resident Unit Manager, Dr. Huff (Huff), and Dr. Paul Harvey (Harvey) (collectively the State Defendants), claiming a violation of his Eighth Amendment right to be free from cruel and unusual punishment and gross negligence for failing to protect him from physical injury and not providing proper medical care while he was incarcerated.

Scicluna also sued Macomb County prosecutor Carl Marlinga and Assistant Macomb County prosecutor Jane/John Does, and Macomb County, (collectively the Macomb Defendants) claiming malicious prosecution/abuse of process under § 1983 and state law. The Macomb Defendants were dismissed with prejudice by stipulation on October 20, 1999.[1]

Thereafter Carrizales, Huff, Harvey, Straub and Borgert filed separate motions for summary judgment. A hearing on the motions was held on August 5, 2002, at which the Court denied Carrizales's and Huff's motion for summary judgment. *See* Order Denying Defendant Carrizales's and Defendant Huff's Motions for Summary Judgment, filed August 5, 2002. The Court also directed Scicluna to file a supplemental paper detailing the facts to support his claims against Harvey, Straub, and Borgert. Upon review of the record, including Scicluna supplemental paper, Straub and Borgert's motions will be granted and Harvey's will be denied.

## II. *Factual Background*

The following facts are gleaned from the parties' papers.[2]

### A. *Underlying Crime*

In July 1988, Scicluna, a citizen of Malta, pled guilty to felony narcotics charges in state court in Macomb County. Afraid of being deported, he told the Macomb County prosecutors that he would plead guilty if he would not be deported to Malta. The prosecutors allegedly assured Scicluna that he would not be deported. However, the prosecutors neither gave the Court a plea recommendation opposing deportation, nor said anything to such effect. Scicluna was sentenced 10 to 30 years in prison. He was initially assigned to the Muskegon Correctional Facility (MCF) in 1988.

### B. *Scicluna's Placement and Treatment While at MCF*

1.

On September 14, 1989, Scicluna's co-defendant, Gino O'Sullivan (O'Sullivan), ar-

---

1. On May 30, 2001, the State Defendants were dismissed by party stipulation. On October 18, 2001, the Court granted Scicluna's motion to vacate the dismissal against the State Defendants.

2. The parties' statements of material facts not in dispute, while somewhat compliant with the Court's Motion Practice Guidelines, do not include all of the relevant facts needed to support summary judgment. After reading through the parties' papers, however, including Scicluna's supplemental paper, there are sufficient grounds to grant summary judgment to Straub and Borgert and to deny summary judgment as to Harvey, as discussed below.

rived at MCF. Fearing retaliation in the form of physical harm, Scicluna, his brother, and sister-in-law contacted Wells to protest O'Sullivan's placement at MCF. No action was taken by Wells.

Scicluna also asserts that he told Carrizales, his Resident Unit Manager, that he was afraid of O'Sullivan on several occasions. Scicluna told Carrizales that, "I had just spotted Gino, that according to the rules of the system, that two persons that were involved in the same crime or enemy of each other cannot be housed together. I brought this to his attention, and told him that this makes me feel uncomfortable because I do not know what's on this man's mind, and I had—the only response I've got out of the system is, 'Don't worry about it.'" Carrizales denies that Scicluna told him that O'Sullivan intended to harm him. Carrizales did not recommend a transfer, nor did he direct that Scicluna be isolated.

On April 20, 1992, Daniel Jenkins, a prisoner paid by O'Sullivan to attack Scicluna, beat Scicluna on the head with a weight or a lock contained in a sock in the weight lifting area.

2.

Scicluna was taken to a community hospital for emergency neurosurgery. The initial part of the surgery was performed by Dr. Roufca. A section of Scicluna's skull was removed. Roufca recommended that Scicluna undergo a cranioplasty to replace the removed portion of the skull.

Scicluna was returned to MCF and placed on "temporary segregation" status pending investigation of the assault.

3.

Huff evaluated Scicluna at MCF and spoke with Roufca on April 27, 1992. Huff prescribed Dilantin to Scicluna to prevent seizures on April 28, 1992. On an April 28 order, Huff noted that Scicluna should "continue Dilantin depending on level."

Scicluna was seen by nurses at MCF on April 29, 30 and 31, 1992 and on May 1, 2, 3 and 4, 1992. On May 4, 1992, Huff reevaluated Scicluna. He noted that Scicluna was alert, had normal speech and good muscle strength. Huff arranged for Scicluna to be transported to Kinross Correctional Facility (KCF) for neurosurgical consultation on May 5, 1992. However, because KCF did not have medical facilities capable of conducting neurosurgery, Scicluna was transferred to Jackson Cotton Facility (JCF) on May 6, 1992.

### C. Scicluna's Placement and Treatment While at JCF

1.

Upon his arrival at JCF, a nurse filled out an Emergency Treatment Report indicating that, according to his transfer sheet, Scicluna needed an "immediate neuro consult." Scicluna was referred for follow-up treatment to Harvey.

2.

While at JCF Scicluna says that he was placed in a top bunk and that he and other families members had to "fight with" JCF staff regarding this placement. Scicluna says that he should have been given a bottom bunk placement because of his propensity for seizures. Also while at JCF, Scicluna says that several of his family members contacted either Straub, then the deputy warden, and Borgert, then the warden, to express their concern over his medical care. Specifically, Denise Scicluna, Scicluna's sister-in-law, says that she told Straub that Scicluna was not receiving medical treatment; and Pamela Scicluna, Scicluna's ex-wife, says that she questioned someone at JCF regarding Scicluna's medication.

3.

Scicluna was seen by nurses at JCF on May 8, 9 and 11, 1992 and was seen by a psychologist on May 15, 1992. The psy-

chologist noted in Scicluna's chart that he was having difficulty with memory and with motor control on his left side and in both extremities. The psychologist also noted that Scicluna's "symptoms as described could result from [his] head injury."

On May 21, 1992, Scicluna was seen by a nurse who noted in his chart that he had slurred speech and a slow gait. The nurse also noted that Scicluna reported that he had no change in his status since his head injury. Finally, the nurse noted that a follow-up with Harvey was scheduled.

### 4.

Harvey conducted his initial evaluation of Scicluna on May 26, 1992. Harvey noted that Scicluna had slurred speech and a slow gait. Harvey also noted that Scicluna was taking Dilantin. Harvey ordered lab tests on Scicluna's Dilantin level and arranged for Scicluna to be transferred to Duane Waters Hospital (DWH) to meet with Dr. Harish Rawal (Rawal) for a neurosurgical consultation. Harvey ordered Scicluna to be placed on low bunk detail for 90 days and to be placed on medical "00" status for 90 days. Harvey also ordered that Scicluna be allowed to sit at a handicapped table for meals for 90 days.

### D. Scicluna's Treatment by Rawal [3]

### 1.

On May 27, 1992, Rawal evaluated Scicluna and noted that he was experiencing problems with his speech and gait. He reported that he suspected Scicluna was suffering from Dilantin toxicity. He ordered that a Dilantin level be determined immediately and also ordered a head x-ray. On May 27, 1992 it was determined that Scicluna was suffering from Dilantin

toxicity. Rawal discontinued Scicluna's Dilantin for May 27, 28 and 29, 1992. He ordered that Scicluna resume taking Dilantin on June 1, 1992 and be administered Dilantin on a restricted medication line.

### 2.

Denise Scicluna, says that Scicluna called her on May 27, 1992 and told her that he was told not to continue taking Dilantin. Denise Scicluna wrote a letter of May 28, 1992 to Harvey requesting that he contact her regarding Scicluna's treatment and follow-up care with Roufca.[4] On May 28, 1992, Harvey wrote a letter to Denise Scicluna responding to her request stating that Scicluna had experienced Dilantin toxicity and noted that this was due to Scicluna's "over medication of himself because of his poor short-term memory" and that he would be place on a restricted medication line.

### 3.

On June 3, 1992, Rawal evaluated Scicluna and determined that he could resume taking Dilantin. Rawal recommended that Scicluna undergo a cranioplasty. On June 24, 1992, Rawal discussed his recommendation that Scicluna receive a cranioplasty in which an acrylic plate (acrylic plate cranioplasty) would be placed in Scicluna's skull with Denise Scicluna. Rawal reported that Denise Scicluna questioned him regarding whether a bone-graft cranioplasty, in which bone taken from Scicluna's hip is placed in Scicluna's skull, would be better. Rawal recommended not to pursue the bone-graft cranioplasty because it required multiple surgeries and "entail[ed] more risk."

### E. Scicluna's Treatment at LRF

On July 22, 1992, Harvey contacted Roufca for a consultation with Scicluna. On July 24, 1992, Scicluna sent Harvey a kite [5] stating, "I would like to talk to you

---

**3.** It is unclear whether Rawal treated Scicluna exclusively at DWH or at JCF as well.

**4.** Harvey says that Borgert initially received the letter and forwarded it to him.

**5.** A kite is an internal written communication from a prisoner.

again pertaining to my injury. I have thought about what you said, and want to see you again." Scicluna says that Harvey did not respond.

Harvey transferred Scicluna to LRF[6] on August 5, 1992 to be evaluated by Roufca. Roufca recommended that Scicluna be given a bone-graft cranioplasty.[7] On September 10, 1992, Scicluna sent Huff a kite stating: "I want you to know wich [sic] you do know that you and this staff of LRF. Brooks are mentally kill [sic] me slowly kills me is this the way you handle prisoner. Health is bad." Huff did not respond. Scicluna was transferred back to JCF on September 24, 1992.

### F. Scicluna's Continued Treatment at JCF

#### 1.

Harvey agreed with Rawal's recommendation for Scicluna to receive an acrylic plate cranioplasty. Denise Scicluna says that Harvey told her that the bone-graft cranioplasty was "better, but he was going with the less expensive" acrylic plate cranioplasty. Denise Scicluna consented on behalf of Scicluna to the acrylic plate cranioplasty.

On November 12, 1992, Scicluna received an acrylic plate cranioplasty.

#### 2.

On December 15, 1992, Mr. Bland (Bland), Director Classification at JCF, sent a Request for Prisoner Unemployable Status to Straub. In the request, Bland noted that Scicluna had refused to be tested for reading and math. Accordingly, Bland recommended that Scicluna be designated as "Unemployable 00" until he agreed to be tested so that he could be placed in GED school. Based on the request form, Straub approved Scicluna's designation as "Unemployable 00." Scicluna wrote various kites to Straub, Harvey and Borgert contesting the designation. Scicluna argued that he should have been placed on "Medical 00" designation after his cranioplasty. Scicluna also stated that he did not refuse to take the placement tests. As a result of his designation as "Unemployable 00," Scicluna was confined to his cell between 8:30 a.m. and 4:30 p.m. except for meals, medical appointments, visits, exercise and law library call outs. Moreover, Scicluna had good time credits withheld for his failure to take the placement examination.

#### 3.

On July 11, 1993, Scicluna sent Straub a kite stating, "I'm having a difficult problem with the staff and I'm being mentally and physically abuse by the staff. I need to be called out to discuss this problem as soon as possible please. Since Friday, my health condition has gotten worse. I need your assistance." Straub did not respond.

#### 4.

Scicluna remained in prison until September 1993, when he was released on parole. The INS picked up Scicluna soon after his release for deportation proceedings based on his 1988 plea. Scicluna remained in confinement until March 4, 1998. Scicluna was deported to Malta sometime between March 1998 and the present, where he continues to live.

### III. Analysis

#### A. Summary Judgment Standard

Summary judgment is appropriate when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a

---

6. The parties do not provide any clarification of the acronym LRF.

7. Roufca's report recommending the bone-graft cranioplasty is not in evidence.

whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 101 (6th Cir. 1995).

### B. *42 U.S.C. § 1983 Claims*

#### 1. *Claims Against Harvey*

##### a.

■ Scicluna claims that Harvey violated his Eighth Amendment rights to be free from cruel and unusual punishment by failing to provide proper medical care while he was incarcerated. To establish an Eighth Amendment claim, Scicluna must show that Harvey was deliberately indifferent to a substantial risk of serious harm. *Napier v. Madison County*, 238 F.3d 739 (6th Cir.2001). In the context of medical care, "an inadvertent failure to provide adequate medical care" is not evidence of deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 105–6, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Accordingly, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* However, while medical malpractice does not constitute a constitutional violation, the Court of Appeals for the Sixth Circuit has explained that grossly inadequate medical care that is "so

grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," constitutes deliberate indifference. *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834 (6th Cir.2002) (holding that a genuine issue of material fact existed over whether decedent's treating physicians were deliberately indifferent to his medical needs when they failed to follow hospital protocol; did not return pages designated as STAT for over an hour or waited for an hour to treat the decedent despite knowledge that he was suffering from an emergency medical condition; failed to take precautions to prevent the decedent's hyperthermia despite knowledge that the ward in which the decedent was placed was unusually hot, the decedent was being permitted to go outside in the summer heat, and the medication prescribed to the decedent caused drug-induced hyperthermia and increased the risk of heat stroke).

##### b.

■ Scicluna argues that Harvey acted with deliberate indifference toward his medical needs by: 1) failing to see him for three weeks after his arrival at JCF which delayed Scicluna from being treated for toxic levels of Dilantin, 2) failing to consider the effect that a particular surgery could have on Scicluna, instead preferring the cheapest way, which was an acrylic bone cranioplasty as opposed to a bone graft cranioplasty, and 3) ignoring Scicluna's requests for medical treatment for post-operation pain.

■ "[A]n inmate who complains a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Napier*, 238 F.3d at 742 (6th Cir.2001). Scicluna argues that

he suffered from the effects of Dilantin toxicity for three weeks due to Harvey's delay in evaluating him. The nurses' and psychiatrist's report on Scicluna's medical record during his first three weeks at JCF indicate that he was suffering from a slow gate and had problems with his speech. Accordingly, there is evidence that Scicluna may have been suffering from Dilantin toxicity while waiting to be evaluated by Harvey.

When Scicluna was first admitted to JCF it was noted on the Emergency Treatment report that Scicluna required an "immediate neuro consult" and was referred to Harvey. Harvey does not offer a reason for his delay in evaluating or treating Scicluna. Accordingly, there are genuine disputed issues of fact over: 1) whether Harvey was deliberately indifferent to Scicluna's medical needs by providing grossly inadequate medical care when he failed to evaluate Scicluna for three weeks after receiving a referral for an "immediate neuro consult;" and 2) whether the delay in treatment caused Scicluna to suffer from the effects of Dilantin toxicity.[8] Accordingly, Harvey's motions is denied on these grounds.

■ However, Scicluna's argument that Harvey was deliberately indifferent to his medical needs for failing to approve of the bone-graft cranioplasty and failing to consider the effect that this treatment may have on him lacks merit. Scicluna presents no support for his argument that an acrylic plate cranioplasty preformed on him was less efficacious than a bone-graft cranioplasty. Further, Scicluna presents no evidence of Roufca's rationale for recommending the bone-graft cranioplasty. Rawal recommended that Scicluna undergo an acrylic plate cranioplasty because it did not require multiple surgeries and was

less risky. Accordingly, Harvey's decision to approve the acrylic plate cranioplasty over the bone-graft cranioplasty does not reflect deliberate indifference to Scicluna's medical needs.

■ Finally, Scicluna argues that Harvey was deliberately indifferent to his medical needs by ignoring his requests for treatment for post-operation pain. Scicluna, however, has presented no evidence that he made any requests for the treatment of post-operation pain. Accordingly, Harvey did not ignore Scicluna's requests for treatment in deliberate indifference of his medical needs in this regard.

### 2. Claims against Straub and Borgert

Scicluna argues that Straub and Borgert violated his Eighth Amendment right to be free from cruel and unusual punishment by: 1) allowing him to be placed on a top bunk; 2) being deliberately indifferent to his medical needs; and 3) placing him on "Unemployment 00" status.

■ To establish an Eighth Amendment claim, Scicluna must show that Straub and Borgert were deliberately indifferent to a substantial risk of serious harm. *Napier v. Madison County*, 238 F.3d 739 (6th Cir.2001). A prison official is deliberately indifferent if he is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). First, Scicluna presents no evidence that either Straub or Borgert had any involvement in the decision to place him on a top bunk even if they were aware of the decision. A prison official is not deliberately indifferent to a substantial

---

**8.** Harvey seems to argue that he is entitled to qualified immunity; the argument, however, is not clearly articulated.

risk of serious harm, however, for merely failing to intervene in a decision made by other prison officials. *See Shehee v. Luttrell,* 199 F.3d 295 (6th Cir.1999) (holding that a prisoner did not have a § 1983 claim against prison officials who had not "directly participated, encouraged, authorized, or acquiesced" in the allegedly unlawful conduct.) Accordingly, Straub and Borgert were not deliberately indifferent by failing to intervene in the decision to place Scicluna in a top bunk.

■ Second, Scicluna's argument that Borgert and Straub were deliberately indifferent to his medical needs lacks merit. Scicluna was treated by various medical professionals while at JCF. He received medication and several evaluations by neurosurgeons. In fact, Scicluna received an acrylic cranioplasty while at JCF. While Scicluna argues that Straub was deliberately indifferent to his medical needs by failing to respond to his kite of July 11, 1993, he does not explain the "health condition" to which Straub failed to respond or in what ways the JCF staff was abusing him. Accordingly, there is no evidence that Borgert or Straub were deliberately indifferent to Scicluna's medical needs.

■ Third, Scicluna argues that Straub violated his Eighth Amendment rights by placing him on "Unemployment 00" status. The decision to place Scicluna on "Unemployment 00" status instead of "Medical 00" status was an administrative decision incidental to prison management. To require a hearing to determine whether Scicluna's status was proper would interfere with prison administration. *See Ward v. Dyke,* 58 F.3d 271 (6th Cir.1995) Accordingly, Scicluna does not have a constitutional right to be placed on "Medical 00" status. *See Id.* (holding that prisoners do not have a constitutional right to challenge an administrative decision to transfer them from one prison to another).

### C. State Law Gross Negligence Claims

■ Scicluna also asserts state law claims for gross negligence against Harvey, Straub and Borgert. Gross negligence is defined by statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." M.C.L.A. § 691.1407(2)(c); *Maiden v. Rozwood,* 461 Mich. 109, 597 N.W.2d 817 (1999). Scicluna argues that the same conduct which forms the basis of his Eighth Amendment claims form the basis for his gross negligence claims.

While gross negligence requires only a showing that a defendant acted recklessly, the same analysis applies to Scicluna's gross negligence claims as did to his § 1983 claims. Further, the parties do not clearly articulate the distinctions between gross negligence and deliberate indifference and the impact the distinction has on Scicluna's claims. Accordingly, summary judgment will be granted as to Straub and Borgert and denied as to Harvey.

### IV. Conclusion

For the reasons stated above, Straub and Borgert's motions for summary judgment are GRANTED and Scicluna's claims against them are DISMISSED. Harvey's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Scicluna's claims against Harvey for deliberate indifference arising out of his failure to evaluate Scicluna for three weeks after receiving a referral for an "immediate neuro consult," and whether the delay in treatment caused Scicluna to suffer from the effects of Dilantin toxicity CONTINUE; all other claims are DISMISSED.

SO ORDERED.