Ariel PEREZ, Sr., Personal Representative of the Estate of Ariel E. Perez, Jr., Plaintiff,

v.

OAKLAND COUNTY, Oakland County Sheriff's Department, Oakland County Sheriff Michael J. Bouchard, Roberta Rice, Deputy Michael Monroe, Deputy Terry Montgomery, Deputy John Jorganson, Dr. Sarath Hemachandra, and Unknown Oakland County Sheriff's Deputies, Defendants.

No. 03–70171.

United States District Court, E.D. Michigan, Southern Division.

March 31, 2005.

832

Anthony A. Yezbick, Jon H. Berkey Assoc., Kenneth J. Wrobel, Jr., Bloomfield Hills, MI, for Plaintiff.

Steven M. Potter, Potter, Deagostino, Auburn Hills, MI, for Defendants.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Ariel Perez, Sr., the father and personal representative of the estate of Ariel Perez, Jr., commenced this suit in this Court on January 14, 2003, alleging that the Defendants—including Oakland County, its Sheriff's Department, the Oakland County Sheriff, three sheriff's depu-

ties, a caseworker, and a psychiatrist— violated Ariel, Jr.'s rights under the U.S. Constitution by failing to provide appropriate mental health treatment or monitoring while he was being held in the Oakland County Jail in the fall of 2002.[1] Specifically, on November 22, 2002, while Plaintiff was incarcerated in this facility for a probation violation, he attempted suicide by hanging himself from a bed sheet tied to a vent in his cell. As a result of this attempt, Plaintiff died a few days later, on November 26, 2002. Plaintiff's complaint asserts federal constitutional claims under 42 U.S.C. § 1983, as well as state-law claims of gross negligence.

On April 2, 2004, the Oakland County Defendants—specifically, the County, its Sheriff's Department, the Oakland County Sheriff, caseworker Roberta Rice, and sheriff's deputies Michael Monroe, Terry Montgomery, and John Jorganson—filed a motion for summary judgment, arguing that Plaintiff has failed to establish a violation of his Eighth Amendment rights, that the evidence does not support a claim of supervisory or municipal liability, and that the individual County Defendants are entitled to qualified immunity from liability. On March 31, 2004, Defendant Sarath Hemachandra, a psychiatrist who provided mental health services to Plaintiff while he was housed at the Oakland County Jail, also moved for summary judgment, arguing that there is no evidentiary basis for finding that he violated Plaintiff's Eighth Amendment rights. Both of these motions have been fully briefed by the parties.

On August 26, 2004, the Court met with counsel in chambers to address Defendants' motions. Having considered the statements of counsel at this conference, and having reviewed the parties' briefs and

1. Since Plaintiff Ariel Perez, Sr. has brought this suit on behalf of the estate of his deceased son, and since the incidents at issue in this case involve only Ariel Perez, Jr., the Court will henceforth refer to Ariel, Jr. as the "Plaintiff" in this action.

the other materials in the record, the Court is now prepared to rule on these motions. This Opinion and Order sets forth the Court's rulings.

## II. *FACTUAL BACKGROUND*

The factual record in this case is largely undisputed. Plaintiff's decedent, Ariel Perez, Jr., was 19 years old on the date of his death by suicide, November 26, 2002. Prior to his death, Plaintiff had been diagnosed as suffering from mental illness, and he had been incarcerated at the Oakland County Jail on a number of occasions. This background will be briefly recounted here, as it is relevant to the incidents at issue in this case.

### A. Plaintiff's Prior Terms of Incarceration at the Oakland County Jail

Plaintiff's first period of incarceration at the Oakland County Jail spanned from November 16 to November 30, 2000. He then was incarcerated at this facility from April 14 through April 20, 2001. The record is not clear as to the reasons for these confinements, but they apparently passed without incident.

In February of 2001, Plaintiff pled guilty to two charges of felony larceny from a building, and he was given a six-month sentence on May 11, 2001. Plaintiff was 17 years old at the time, and it was determined that this sentence should be served at a boot camp. Plaintiff was returned to the Oakland County Jail in late June of 2001, however, after he reported to a boot camp counselor that he was experiencing hallucinations and hearing voices telling him to quit or escape. Upon returning to the jail, he was seen by Defendant Roberta Rice, an inmate caseworker. Plaintiff told Rice that he had been hearing voices for the past two years telling him to hurt himself, but that he did not listen to these voices. He also reported having tried to hang himself at ages 14 and 17.

Based on these issues, Plaintiff was sent for a psychiatric evaluation by Defendant Dr. Sarath Hemachandra on July 5, 2001. Dr. Hemachandra's examination report noted Plaintiff's history of hearing voices and considering suicide, and he also reported that Plaintiff had a learning disability, had been diagnosed as suffering from ADHD, and had taken Ritalin for several years as a child. Dr. Hemachandra diagnosed Plaintiff with a schizoaffective disorder, a personality disorder, and a learning disorder, and he prescribed psychiatric medication, individual counseling, and substance abuse counseling.[2] More generally, Dr. Hemachandra opined that Plaintiff should be "watched closely." (Plaintiff's Response, Ex. 4, Hemachandra 7/5/2001 Evaluation Report.)

As a result of the assessments by Dr. Hemachandra and Rice, Plaintiff was housed with a roommate and placed on a 30–minute "active behavior watch" ("ABW"). This status was continued until July 10, 2001, when Rice met with Plaintiff upon learning that he was refusing to take his Zyprexa medication. Following this meeting, Rice discontinued the 30–minute ABW.

On August 20, 2001, Oakland County Jail personnel determined that Plaintiff was suicidal, and he was placed in an attorney booth until he could be seen by Rice. Plaintiff reported to Rice that he had been thinking about cutting himself with a razor or hanging himself with a sheet, and he requested placement in a single cell. Although Rice assured Plaintiff that his statements about suicide were being taken seriously, her notes reflect her view that Plaintiff was being "manipulative in order to get his way." (Plaintiff's Response, Ex.

---

**2.** Plaintiff states that he was never given the counseling ordered by Dr. Hemachandra.

9, Rice 8/20/2001 Report.) Rice also addressed Plaintiff's concerns about his medication, advising him that he could discuss the matter at his next scheduled psychiatric appointment on August 23, 2001. Finally, Rice informed Plaintiff that he would be moved to a front holding tank so that he could be closely supervised. Despite Plaintiff's statement that he would kill himself if moved to the holding tanks, this placement was made and Plaintiff was put on an "active suicide watch" ("ASW").

The next day, Rice apparently met with Plaintiff and downgraded his watch status from ASW to ABW. Plaintiff met again with Rice on August 27, 2001, reporting that he felt better and wished to be moved out of the holding cell. Plaintiff denied any suicidal ideation, and he agreed not to cause trouble if he were moved to the main jail. Citing this promise of cooperation and his apparently stable condition, Rice approved Plaintiff for reassignment to the main jail, and she discontinued his ABW status.

Rice then met with Plaintiff on September 19, 2001, upon learning that he had been placed in an observation cell as a result of a fight with another inmate. Plaintiff reported that he was not suicidal, that he had been taking his medications, and that he was doing okay prior to the fight. Rice discussed with Plaintiff the possibility that he be placed in a single cell, in light of his difficulties in getting along with other inmates, and Plaintiff agreed to this proposal. Rice determined that Plaintiff did not appear suicidal, and that no watch was necessary. However, in response to a query by jail officials whether Plaintiff could be placed in an 11–man cell, Rice opined that this placement was inappropriate in light of Plaintiff's age, mental health treatment, and learning disability. Plaintiff's incarceration apparently continued without incident until his release on October 9, 2001.

Plaintiff next was incarcerated at the Oakland County Jail for two days in late April of 2002, apparently as a result of an altercation with his father. While Plaintiff was being held, Rice spoke to his sister, who reported that Plaintiff had not been complying with his mental health treatment program, and that he was hearing voices telling him to kill himself. Rice informed Plaintiff's sister about the medications he had been given while housed at the jail, and she provided the phone numbers for two mental health treatment programs. Plaintiff also was incarcerated at the Oakland County Jail in late August of 2002, although the reasons for this are not clear from the record.

In the period between his incarcerations in April and August of 2002, Plaintiff received treatment at St. Joseph Mercy Hospital and the North Oakland Medical Center ("NOMC") for depression and suicidal thoughts. In connection with this treatment, a petition for hospitalization was prepared on Plaintiff's behalf, a physician diagnosed Plaintiff as suffering from schizophrenia, he was given antipsychotic medication, and he was placed in a psychiatric ward at NOMC from mid-May until early June. Similarly, in early October of 2002, shortly before his final incarceration at the Oakland County Jail, another petition for hospitalization was prepared on Plaintiff's behalf, after he appeared at the NOMC emergency room and reported that he was hearing voices telling him to hurt his sister and break into a restaurant. Plaintiff again was diagnosed with schizophrenia on this occasion.

**B. Plaintiff's Final Period of Incarceration at the Oakland County Jail**

Against this backdrop, Plaintiff was booked into the Oakland County Jail on October 24, 2002 for violating his probation. Early the next morning, Plaintiff

informed a guard that he was hearing voices and requested to speak to a counselor immediately, but he denied being suicidal. Just over an hour later, however, Plaintiff apparently attempted suicide by tying his pants around his neck and the bars of his holding cell. Plaintiff was placed in an observation cell, put on ASW status, and seen by Rice, who continued the suicide watch. Plaintiff also was seen by Dr. Hemachandra on an emergency basis that day, and he reportedly told the psychiatrist that he had attempted to hang himself in order to see a counselor sooner and to obtain the medications, lithium and Zyprexa, that he had been taking prior to his incarceration. Plaintiff denied any suicidal ideation or hallucinations, however. Dr. Hemachandra prescribed the medications sought by Plaintiff, and recommended that he be kept under close observation.

Plaintiff next met with Rice on October 28, 2002, reporting that he felt better since receiving his psychiatric medication, and denying any suicidal ideation. Regarding the recent hanging incident, Plaintiff again stated that he was not trying to hurt himself, but that he acted out of a desire to be moved out of the holding tank and given his medication. Following this meeting, Rice discontinued Plaintiff's ASW status and approved his transfer to the general prison population, finding that Plaintiff was cooperative and that his thought processes appeared to be within normal limits.[3] On October 30, 2002, Plaintiff was moved to a 10–man cell.

Rice again met with Plaintiff on November 4, 2002, following a report that Plaintiff was refusing his psychiatric medication. On this occasion, Plaintiff reportedly stated that he did not need the medication, and that he had lied about his symptoms in the past in order to obtain medication that would help him to cope with his incarceration. Plaintiff acknowledged that he had been depressed in the past, but stated that he "became a Christian … and now has a purpose in his life." (Plaintiff's Response, Ex. 19, Rice 11/4/2002 Report.) Plaintiff also denied any suicidal ideation, and he sought a cell assignment that would permit him to work on his GED. Rice concluded that Plaintiff "appears manipulative in order to get his way," found that he did not appear suicidal and that he "appears stable at this time," and determined that no watch was needed. (Id.)

Plaintiff was evaluated by Dr. Hemachandra on November 8, 2002. In his report from this session, Dr. Hemachandra recounted Plaintiff's history of ADHD, cannabis dependence, suicide attempts, paranoia and mood swings. The psychiatrist also spoke to Plaintiff about his past reports of hearing voices, but Plaintiff responded that these reports were false, and that he merely wanted medication to help his depression and insomnia. As he had done back in July of 2001, Dr. Hemachandra again diagnosed Plaintiff as suffering from a schizoaffective disorder, as well as cannabis dependence, a learning disorder, and a personality disorder, but he found no evidence of suicidal ideation. Dr. Hemachandra recommended that Plaintiff be given individual counseling and substance abuse counseling.[4] He also prescribed Zyprexa and lithium, and, in light of his awareness that Plaintiff had not been taking his psychiatric medications, he stressed

---

3. As noted by Plaintiff, once the ASW status was discontinued, Plaintiff's status was updated to "PSU," reflecting a prisoner who is not currently being watched but who has historically been considered potentially suicidal.

4. Again, Plaintiff states that no such counseling was provided.

to Plaintiff the importance of taking these medications.

Plaintiff next met with Rice on November 18, 2002, as a result of a request by Defendant Deputy John Jorganson that Plaintiff be approved for single cell housing. According to Rice's report, Plaintiff had been stealing from other inmates in his 10–man cell, and he admitted to Rice that he had been stealing. Plaintiff also informed Rice that he was still refusing his psychiatric medication, and that he continued to believe this medication was not necessary. When asked why he had not discussed this matter with Dr. Hemachandra, Plaintiff reportedly stated that he had been urged by his cellmates to continue receiving the medication so that he could sell it to them.[5] More generally, Plaintiff denied any suicidal ideation, reported frequent visits and contact with his family, and stated that he was not experiencing any depression or anxiety. Rice concluded that Plaintiff's "insight appears limited" and "[j]udgement appears poor," but that he did not appear suicidal, was stable, and was appropriate for single cell housing without any need for watch status. (Oakland County Defendants' Motion, Ex. C, Rice 11/18/2002 Report.)

The next day, November 19, 2002, Rice reviewed Plaintiff's case with Dr. Hemachandra, apparently in light of Plaintiff's continued refusal to take his psychiatric medications. Consistent with a standard protocol designed to minimize the amount of unused medication in the jail environment, Dr. Hemachandra discontinued Plaintiff's medications, but he advanced Plaintiff's next scheduled appointment with him from November 29 to November 26.

On the evening of November 22, 2002, Defendant Deputy Michael Monroe was working in the C–Block area of the Oakland County Jail where Plaintiff was housed, and he was relieved that evening by Defendant Deputy Terry Montgomery. As noted, Plaintiff was not on any sort of watch status at the time. The record indicates that "clock rounds" of Plaintiff's jail cell were performed at 5:47 p.m. and 7:03 p.m., a gap of approximately 76 minutes.[6] According to a fellow inmate, Plaintiff placed a sheet over his cell during this period, in order to block the view into his cell. Upon performing their 7:03 p.m. rounds, jail personnel discovered that Plaintiff had hung himself with a bed sheet that had been tied to the vent of his cell. He died from his injuries a few days later, on November 26, 2002.

## III. ANALYSIS

### A. The Standards Governing Defendants' Motions

Two motions presently are pending before the Court. Defendant Sarath Hemachandra has brought his motion under both Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 56, while the Oakland County Defendants appeal solely to the latter rule. Because the Court has considered matters outside the pleadings, both motions will "be treated as [seeking] summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). Under this rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

---

5. Plaintiff further stated that he ultimately decided not to go through with this scheme, and instead merely refused the medication when it was offered to him.

6. Plaintiff states that Oakland County Jail policy calls for "clock rounds" to be performed every 60 minutes, unless an inmate is on disciplinary or special watch status.

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. *Celotex* explains:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing this trilogy of Supreme Court decisions, the Sixth Circuit adopted a series of principles governing motions for summary judgment:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving Defendants' motions.

**B. Plaintiff's § 1983 Claims Against the Individual Defendants**

**1. The Standards Governing Eighth Amendment Claims**

As the basis for his federal constitutional claims under 42 U.S.C. § 1983, Plaintiff cites the Eighth Amendment protection against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs. *See Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976); *Comstock v. McCrary*, 273 F.3d 693, 702–03 (6th Cir.2001). Yet, because the Eighth Amendment prohibits only mistreatment tantamount to "punishment," the courts have imposed liability upon prison officials only where they "are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir.

1994) (citing *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291). Mere negligence or medical malpractice alone cannot sustain an Eighth Amendment claim, absent a showing of deliberate indifference. *See Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 291–92; *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir.1999) (*en banc* ).

■■■ The "deliberate indifference" inquiry has both objective and subjective components. *See Comstock*, 273 F.3d at 702. First, in cases involving an inmate's medical needs, the need "must be, objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994) (internal quotations and citation omitted); *see also Estelle*, 429 U.S. at 104, 97 S.Ct. at 291. Regarding the subjective component, the Sixth Circuit has emphasized that a plaintiff must produce evidence showing "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979). As the Supreme Court has explained, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838, 114 S.Ct. at 1979. This Court recently recognized that "the subjective prong of the 'deliberate indifference' standard is not easily met," as it requires evidence of what prison officials actually knew or believed, and not merely what they should have perceived. *Joseph v. City of Detroit*, 289 F.Supp.2d 863, 872 (E.D.Mich.2003).

■■■ As Plaintiff points out, the Sixth Circuit has provided more specific guidance in applying this Eighth Amendment standard of "deliberate indifference" to cases of claimed medical mistreatment. In particular, "deliberate indifference may be established by a showing of grossly inadequate care as well as [by] a decision to take an easier but less efficacious course of treatment." *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834, 843 (6th Cir.2002) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir.1999)). This standard of "grossly inadequate care," in turn, has been described as "medical treatment 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' " *Terrance*, 286 F.3d at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir.1989)).[7]

■■■ Yet, as emphasized in the very same line of Eleventh Circuit decisions relied upon in *Terrance*, a showing of "grossly inadequate care" satisfies only the ***objective*** prong of the "deliberate indifference" standard, and does not subsume or otherwise dispense with the distinct requirement that the plaintiff present evidence of a prison official's ***subjective awareness*** of, and disregard

---

**7.** This Court professes some confusion as to the panel's suggestion in *Terrance* that "less flagrant conduct" suffices to establish the "lower ... standard" of deliberate indifference in "medical mistreatment cases." *Terrance*, 286 F.3d at 843, 847. Surely, medical professionals are not held to a more stringent legal standard than other prison officials in Eighth Amendment cases, and nothing in *Estelle* or its progeny could be construed as supporting such a view. To the contrary, *Estelle* itself emphasizes that medical mistreatment must be tantamount to the "unnecessary and wanton infliction of pain" in order to satisfy the "deliberate indifference" standard. *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291 (internal quotations and citation omitted). Thus, to the extent that *Terrance* might be read as adopting a different standard of "deliberate indifference" than the Supreme Court announced in *Estelle*, the Court necessarily is bound to follow *Estelle*.

for, a prisoner's serious medical needs. *See Campbell v. Sikes,* 169 F.3d 1353, 1364–65 & n. 9 (11th Cir.1999) (casting doubt upon the decision in *Waldrop* in light of its apparent focus solely upon the objective prong of the "deliberate indifference" inquiry).[8] Similarly, in an *en banc* decision in a prison suicide case, the Sixth Circuit emphasized that the defendant prison psychiatrists must have known of, and yet disregarded, an excessive risk to inmate health or safety. *See Williams,* 186 F.3d at 691–92 (*en banc*); *see also Comstock,* 273 F.3d at 703 (observing that the subjective element of the "deliberate indifference" test "is meant to prevent the constitutionalization of medical malpractice claims"). Against this legal backdrop, the Court turns to Plaintiff's specific claims against the individual Defendants.

### 2. Plaintiff's Eighth Amendment Claims Against Defendants Rice and Hemachandra

Although Plaintiff has named both health care professionals and prison guards as Defendants, the Court believes it appropriate to separately analyze the claims against these two categories of parties. Specifically, as to Defendants Roberta Rice, an inmate caseworker at the Oakland County Jail, and Dr. Sarath Hemachandra, a psychiatrist who provides mental health services to prisoners housed at the jail, Plaintiff's claims are more properly analyzed under the medical mistreatment standards set forth in such Sixth Circuit decisions as *Williams, Comstock,* and *Terrance.* The claims against the remaining Defendants, in contrast, are better suited for consideration under the more general standard of "deliberate indifference."

Turning, then, to the federal Eighth Amendment claims against Defendants Rice and Hemachandra, Plaintiff's general theory of liability, of course, is that a different course of mental health treatment and a different housing arrangement at the Oakland County Jail would have prevented his suicide. As all agree, prisoners do not have a generalized right to be correctly screened for suicidal tendencies, or to be absolutely protected against committing suicide. *See House v. County of Macomb,* 303 F.Supp.2d 850, 854 (E.D.Mich.2004) (quoting *Davis v. Fentress County,* 6 Fed.Appx. 243, 248–49 (6th Cir.2001)). Yet, it is just as clear that a prisoner's "psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Horn,* 22 F.3d at 660; *see also Comstock,* 273 F.3d at 703; *Davis,* 6 Fed.Appx. at 248–49.

Under the objective prong of the "deliberate indifference" standard, Plaintiff must produce evidence of a "serious medical need" that Defendants Rice and Hemachandra were obliged to address. As noted, this can be shown through objective evidence of "grossly inadequate care." *Terrance,* 286 F.3d at 843. In the more specific context of a prisoner suicide, the Sixth Circuit has stated that the relevant inquiry is whether the evidence establishes a "strong likelihood" that the prisoner would attempt to take his own life. *Barber v. City of Salem,* 953 F.2d 232, 239–40 (6th Cir.1992); *see also Davis,* 6 Fed.Appx. at 248–50; *House,* 303 F.Supp.2d at 854.

The Court finds that genuine issues of material fact remain as to this prong of the "deliberate indifference" inquiry. It is undisputed that Plaintiff was consistently diagnosed with a significant mental illness, that he was repeatedly treated for this condition over a long period of time, and

---

**8.** Notably, while the panel in *Terrance* stated that it was "guided by" the Eleventh Circuit's decision in *Waldrop, see Terrance,* 286 F.3d at 844, it failed to observe that the Eleventh Circuit itself had called this ruling into question in *Campbell.*

that psychiatric medication was prescribed for this disorder. Indeed, upon examining Plaintiff just two weeks before his suicide, Dr. Hemachandra diagnosed him as suffering from a schizoaffective disorder, among other conditions, and he recommended counseling and medication for this condition. Dr. Hemachandra's report of his November 8, 2002 psychiatric evaluation also disclosed Plaintiff's past history of suicide attempts and ADHD, and found that he continued to experience mood fluctuations and paranoia. Thus, it is apparent that Plaintiff suffered from a major mental disorder that required ongoing attention and treatment, as evidenced by Dr. Hemachandra's treatment recommendations and his scheduling of a follow-up appointment later in November.

Moreover, this record would permit, albeit not compel, the conclusion that Plaintiff posed some likelihood of another suicide attempt. To be sure, Dr. Hemachandra opined that Plaintiff gave no indication of suicidal ideation during his final evaluation on November 8, 2002. Similarly, Rice's counseling notes during this time period of early to mid-November show that Plaintiff denied any suicidal ideation, and they reflect Rice's conclusion that Plaintiff was not suicidal or otherwise in need of an enhanced watch status. Yet, there is no question that Plaintiff had both threatened and attempted suicide in the past, and that he had been repeatedly placed on behavior and suicide watches during his periods of incarceration at the Oakland County Jail. Indeed, as recently as late October of 2002, Plaintiff apparently attempted suicide in his Oakland County Jail cell,[9] leading Rice to place him in an observation cell under an active suicide watch, and leading Dr. Hemachandra to recom-

mend that he be kept under close observation.

Although Dr. Hemachandra opined at his deposition that someone who has previously considered or attempted suicide does not "necessarily" pose a present risk of suicide, he acknowledged that such threats and attempts are factors to be considered in making such an assessment. (See Oakland County Defendants' Motion, Ex. E, Hemachandra Dep. at 33.) Dr. Hemachandra further explained that he considers whether a patient is taking his prescribed psychiatric medication, and he acknowledged that a patient who fails to do so might become depressed, unstable, unable to control his moods, and suicidal. (See id. at 33, 46–47.) Indeed, in his last meeting with Plaintiff, Dr. Hemachandra emphasized the importance of taking his medication in order to remain stable and keep his depression under control. (See id. at 29.) Along the same lines, Plaintiff has produced an expert opinion stating, among other things, that individuals who suffer from schizophrenia and have made past suicide attempts pose a much higher risk of suicide, and that Plaintiff fell within a higher-risk group of young, unmarried males. Viewing this record in a light most favorable to Plaintiff, the Court finds that questions of fact remain as to whether Plaintiff arguably evidenced a significant likelihood of attempting suicide or otherwise manifested a serious need for mental health care.

The subjective prong of the "deliberate indifference" inquiry presents a much closer question, however, and requires separate consideration of the claims and evidence against Defendants Rice and Hemachandra. Regarding Roberta Rice, an inmate caseworker, the Oakland County Defendants point to Rice's repeated as-

9. Although Defendants seemingly dispute whether this was an actual suicide attempt, there is at least an issue of fact on this point, where the jail's own records reflect a "suicide attempt" on this occasion. (See Plaintiff's Response, Ex. 17.)

sessment in her counseling notes that Plaintiff was not suicidal. Whether or not this assessment was correct, and regardless of whether Rice might have been negligent in failing to perceive the true risk posed by Plaintiff, Defendants argue that the record lacks any evidence that Rice subjectively perceived this risk and yet disregarded it, as required to establish deliberate indifference. More generally, Defendants contend that Rice's conduct should not be analyzed by reference to the Sixth Circuit's medical mistreatment decisions, such as *Terrance*, because Rice's "job responsibility [wa]s to determine watch status and housing, not to make medical decisions regarding an inmate." (Oakland County Defendants' Reply Br. at 4.)

Although the question is a close one, the Court cannot conclude that the record compels a determination in Rice's favor as a matter of law. On one hand, as Defendants correctly point out, this is not a case in which prison officials completely ignored an inmate's serious medical needs. Rather, the record reflects that Rice consistently took action and repeatedly met with Plaintiff as problems arose during his several periods of incarceration. When a professional such as Rice provides services, "albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 273 F.3d at 703. Thus, Plaintiff cannot sustain his claim against Rice merely by citing, for example, his expert's opinion that Rice acted incom-

petently in her handling of Plaintiff's mental health and housing needs.

Nonetheless, there is a disturbing lack of consistency in Defendants' argument on this point. They repeatedly emphasize that Rice did not make medical decisions or diagnoses, and yet speak of Rice having "determined" at various points that Plaintiff was not suicidal and that his condition was stable. (*See, e.g.,* Oakland County Defendants' Reply Br. at 3.) While Defendants state that Rice made these assessments as part of her responsibility to make housing assignments and determine watch status, the facts of this very case reveal that such decisions can sometimes affect an inmate's medical needs—here, the need to be monitored for a possible suicide attempt. This is precisely the basis for Plaintiff's and his expert's challenge to Rice's "competence"—namely, that she was making decisions that were essentially medical in nature, or that, at a minimum, could undermine Plaintiff's necessary treatment program, but without the necessary medical background or expertise.

Viewed in this light, the Court finds that issues of fact remain as to whether Rice was subjectively aware of, and yet disregarded, Plaintiff's serious medical needs. Through her several decisions to place Plaintiff on an elevated watch status, most recently less than a month before he committed suicide, and by her occasional determinations to house Plaintiff in an observation cell or with a roommate, Rice arguably demonstrated the subjective knowledge, at least at some points, that Plaintiff posed a risk of suicide.[10] Yet, viewing the record in a light most favor-

---

10. In light of this evidence, the Court cannot agree with Defendants' contention that the decision in *House, supra,* is directly on point here. In that case, the defendant jail officials were aware that the plaintiff suffered from a mental illness, but the record did not disclose any past suicide attempts. In addition, while the plaintiff apparently told jail officials that

she was suicidal, the uniform assessment of all of these officials during the three days between the plaintiff's arrest and her suicide attempt was that the plaintiff was *not* suicidal. *See House,* 303 F.Supp.2d at 851–52. Thus, in granting summary judgment to the defendants on the plaintiff's Eighth Amendment claims, the Court found "no evidence

able to Plaintiff, Rice arguably disregarded this known risk by approving Plaintiff for single cell housing on November 18, 2002, without first referring Plaintiff for a medical assessment by Dr. Hemachandra to confirm that this housing assignment was appropriate, or otherwise ensuring that Plaintiff's mental condition had improved to a degree that would permit this reassignment. Under a view of the evidence most favorable to Plaintiff, a trier of fact could construe Rice's notes of her November 18, 2002 counseling session with Plaintiff as focusing inordinately on Plaintiff's difficulties in getting along with his fellow inmates in his current 10–man cell assignment, while paying insufficient heed to the mental health question of whether Plaintiff posed a risk of suicide if housed in a single cell.

Nor is Rice shielded from liability by virtue of her assessments throughout November of 2002 that Plaintiff did not appear suicidal. *See Comstock*, 273 F.3d at 709–11 (holding that the defendant psychologist's statement that had "exercised his medical judgment" in removing the plaintiff's decedent from suicide watch did not preclude a finding that he was aware of and yet disregarded a risk of serious harm, where there were issues of fact as to whether he performed a "reasoned assessment" in reaching his decision). Initially, the Court notes that it would be difficult to

accord significant weight to this evidence, where Rice herself has acknowledged that she is not qualified to make medical assessments.

Presumably, though, Rice would be entitled to rely upon Dr. Hemachandra's judgment on this issue following his November 8, 2002 evaluation of Plaintiff, but only if the situation remained stable and relatively unchanged in the days after this medical assessment. In fact, however, Rice learned in the interim that Plaintiff had continued to refuse his medications, that he had not sought or obtained Dr. Hemachandra's approval of this course of action during their most recent session, and that he had experienced problems in a 10–man cell and had been stealing from his fellow inmates. In addition, Rice presumably was aware that Plaintiff had never received any of the counseling recommended by Dr. Hemachandra. Under these circumstances, a trier of fact could conclude that Rice disregarded a known risk of serious harm by making decisions about Plaintiff's housing and watch status without securing the considered views of a qualified mental health professional regarding the implications of these decisions to Plaintiff's health and well-being, and without properly considering the possible impact of the various changes in circumstances since Dr. Hemachandra's most recent mental health evaluation.[11]

anyone actually knew that [the plaintiff] was suicidal or facing some other excessive health or safety risk," but that, to the contrary, "the police and medical records created during the relevant period indicate that the key individuals responsible for [the plaintiff's] care and evaluation affirmatively concluded that she was not suicidal." 303 F.Supp.2d at 854.

The record here is significantly different. In particular, Plaintiff had attempted suicide in the past, and there is ample evidence that, at various points during his periods of incarceration at the Oakland County Jail, he had been evaluated by Dr. Hemachandra and caseworker Rice as potentially suicidal and as

requiring a special housing assignment and watch status. In addition, Defendants here had substantial past experience with Plaintiff, and the record reflects evolving mental health needs and varying assessments of Plaintiff's current mental condition. In contrast to the defendants in *House*, who knew only generally that the plaintiff suffered from a mental disorder and that she claimed to be suicidal, Defendants in this case had a sizable store of information at their disposal that would have alerted them to the severity of Plaintiff's condition.

11. Although Rice apparently contacted Dr. Hemachandra on November 19, 2002 to dis-

To be sure, the record does not compel this conclusion. For example, a trier of fact could accept at face value Rice's statements in her November 4 and November 18, 2002 reports that Plaintiff did not appear suicidal. Under this view of the record, whether or not Rice should have perceived a risk of harm, and whether or not she should have trusted her own competence to make, in effect, a medical judgment about the state of Plaintiff's mental health despite the changed conditions since Dr. Hemachandra's most recent evaluation, the brute fact would remain that Rice did not subjectively perceive the danger posed by Plaintiff's condition. Yet, the Court simply is unable to hold that this is the only permissible view of the record, particularly in light of Rice's acknowledged awareness that Dr. Hemachandra had diagnosed Plaintiff as suffering from a significant mental health disorder that required medication, but that Plaintiff recently had refused to take this medication and claimed that he did not need it.

■ The analysis of the claims against Dr. Hemachandra is more straightforward, albeit still by no means clear cut. As with Defendant Rice, it bears emphasis that Dr. Hemachandra did not altogether disregard Plaintiff's mental health needs, but instead examined him and made treatment recommendations on a regular basis, pursuant to the referrals of Rice and other jail officials. Once again, then, Plaintiff cannot sustain his Eighth Amendment claims merely by asserting that Dr. Hemachandra provided negligent or ineffective treatment, or by offering an expert opinion that questions Dr. Hemachandra's medical judgment. See Comstock, 273 F.3d at 703; Williams, 186 F.3d at 691. In particular, it does not matter whether Plaintiff or his expert might disagree with Dr. Hemachandra's determination, following his last evaluation of Plaintiff on November 8, 2002, that Plaintiff did not manifest any suicidal ideation and did not appear to be suicidal. Nor, in contrast to the claims against Defendant Rice, can it be said that such assessments were beyond Dr. Hemachandra's area of expertise. Finally, the subjective prong of the "deliberate indifference" standard cannot be satisfied as to Dr. Hemachandra merely by showing that prison officials failed to carry out his recommended plan for treating Plaintiff's mental illness.

Rather, the only possible indication of a serious health risk that Dr. Hemachandra subjectively perceived and yet failed to act upon concerns Plaintiff's continued refusal to take his psychiatric medications as prescribed by the doctor. Dr. Hemachandra himself recognized the importance of Plaintiff taking his medication, and he emphasized this point to Plaintiff during the November 8 evaluation. Yet, a few days later, on November 19, Dr. Hemachandra learned from Rice that Plaintiff was continuing to refuse his medications. In response, the doctor discontinued the medications and advanced Plaintiff's next scheduled appointment by three days, from November 29 to November 26. He did not, however, offer any opinion as to whether Rice had properly approved

cuss Plaintiff's situation, and particularly his refusal to take his prescribed psychiatric medications, the record does not disclose the content or outcome of this discussion, beyond Dr. Hemachandra's decision to discontinue Plaintiff's medications and to advance his next scheduled appointment from November 29 to November 26. Elsewhere in her deposition, however, Rice made it clear that it was her responsibility to determine an inmate's housing assignment and watch status, and that Dr. Hemachandra could not overrule this decision—or, at least, that he had never before done so. (See Oakland County Defendants' Motion, Ex. G, Rice Dep. at 70–73.)

Plaintiff for a single cell assignment without any special watch status.[12]

The question, then, is whether this absence of affirmative steps by Dr. Hemachandra, in light of the information that his patient was continuing to refuse his recommended psychiatric medications, could be found by a trier of fact to constitute disregard of a known and serious medical need. While the question certainly is a close one, the Court answers it in the negative. First, it bears emphasis that Dr. Hemachandra already knew at the time of his last evaluation of Plaintiff on November 8 that Plaintiff was not taking his medication. (*See* Oakland County Defendants' Motion, Ex. E, Hemachandra Dep. at 27.) Despite this, the doctor determined through his own direct evaluation that Plaintiff "was not suicidal," finding "no evidence of helplessness, hopelessness, death wishes, suicidal thoughts or plans," but that, to the contrary, Plaintiff appeared "upbeat" and looking to the future. (*Id.* at 27–28.) Thus, when Dr. Hemachandra later learned that Plaintiff was continuing to refuse his medications, this alone would not cast doubt upon the doctor's most recent assessment, or establish the doctor's subjective awareness of and disregard for a heightened risk that Plaintiff might harm himself. Moreover, there is no evidence that Dr. Hemachandra learned anything during his November 19 discussion with Rice that would have suggested a heightened risk. For all that appears in the record, he was told only that Plaintiff remained unwilling to take his medications. In any event, even if Rice had reported her own observations to the doctor, he would have learned only that, in Rice's view, Plaintiff was doing well despite refusing his medication.

More importantly, Dr. Hemachandra played no role, nor was his opinion sought, in the fateful decision to approve Plaintiff for single cell housing with no special watch status. Indeed, as to this aspect of the heightened risk of harm posed to Plaintiff, there is no evidence that the doctor even knew that this housing reassignment had occurred. Rather, Rice testified that she did not consult with Dr. Hemachandra prior to clearing Plaintiff for single cell housing on November 18, and that, in her conversation with the doctor the following day, she merely informed him that Plaintiff (i) had denied needing mental health treatment, (ii) was still refusing to take his medication, (iii) had promised to raise these matters during the doctor's November 8 evaluation but had not done so, and (iv) was learning disabled. (*See* Oakland County Defendants' Motion, Ex. G, Rice Dep. at 65–66.) Again, none of this would have suggested that Plaintiff faced an increased risk of harm since Dr. Hemachandra's most recent assessment.

Under this record, the only serious medical need that Dr. Hemachandra could possibly have perceived was the need for periodic assessments to ensure that Plaintiff's mental health was not deteriorating as a result of a prolonged lack of medication. The doctor did not disregard this risk—to the contrary, he advanced Plaintiff's next scheduled appointment by three days upon learning on November 19 that Plaintiff still was refusing his medication. The Court does not view the "deliberate indifference" standard as imposing an affirmative duty upon Dr. Hemachandra to ensure that other prison officials consult with him before making housing or watch status decisions about patients he is treating for mental health conditions. Nor can Dr. Hema-

---

12. As noted, there is no evidence that Rice actually sought Dr. Hemachandra's opinion on this subject.

chandra be said to have disregarded a known risk by failing to insist that he be given the opportunity to re-evaluate Plaintiff's mental health status before any changes were made to this inmate's cell assignment or watch status.[13] At most, the evidence would permit the conclusion that Dr. Hemachandra erred in his professional judgment as to how Plaintiff would function without his medication, and failed to appreciate the heightened risk that might result from this refusal. Such after-the-fact questions about the correctness of medical judgments cannot satisfy the "deliberate indifference" standard. See Comstock, 273 F.3d at 703.[14]

■■■ This leaves only the question whether, despite the evidence in support of an Eighth Amendment claim against her, Defendant Rice nonetheless is shielded from liability by the defense of qualified immunity. Under this doctrine, Rice cannot be held liable for violating an Eighth Amendment right unless this right was "clearly established" at the time of her actions, such that "a reasonable official [in her position] would have understood that [her] conduct violated the right." Com-stock, 273 F.3d at 711. "As the Supreme Court has instructed, [this Court] need not find a case in which the very action in question has previously been held unlawful, but, in light of the pre-existing law[,] the unlawfulness must be apparent." Comstock, 273 F.3d at 711 (internal quotation marks and citation omitted).

Given the closeness of the question whether the record, viewed in a light most favorable to Plaintiff, could establish an Eighth Amendment violation by Defendant Rice, the Court is compelled to conclude that Rice is entitled to qualified immunity. In arguing to the contrary, Plaintiff asserts that the right at issue here is the right to psychiatric care that meets an inmate's serious mental health needs. If so, the Court certainly would agree that this right was "clearly established" at the time of the conduct at issue here. See, e.g., Comstock, 273 F.3d at 711; Horn, 22 F.3d at 660. Yet, the Supreme Court has cautioned against conducting this prong of the qualified immunity inquiry at too high a "level of generality," and has emphasized that "the right the official is alleged to have violated must have been 'clearly es-

13. Plaintiff's expert suggests that Dr. Hemachandra owed an ethical duty to his patients to ensure that he alone, and not unqualified prison employees, made all of the medical judgments relevant to the treatment of their mental health conditions. To the extent that this could be viewed as malpractice, however, this would not suffice to establish deliberate indifference to Plaintiff's serious medical needs. See Comstock, 273 F.3d at 703. Moreover, there is no evidence that Dr. Hemachandra possessed any policymaking authority that would have permitted him to override the procedures in place at the Oakland County Jail for determining cell assignments and watch status.

14. The Court recognizes that it might seem incongruous to hold that only Roberta Rice, and not Dr. Hemachandra, faces potential § 1983 liability in this case, despite the doctor's presumably superior medical expertise in evaluating the suicide risk posed by Plaintiff, and despite the significant overlap in the facts underlying the claims against these two Defendants. Yet, the two sets of facts are sufficiently different, and in crucial respects, to warrant the conclusion that Rice and Dr. Hemachandra are not similarly situated for purposes of the Court's Eighth Amendment analysis. Most significantly, Dr. Hemachandra was not fully apprised of all of the changes in Plaintiff's circumstances since his last evaluation, nor was the doctor asked to opine whether single cell housing was appropriate in light of these circumstances and Plaintiff's underlying condition. Moreover, to the extent that Dr. Hemachandra and Rice alike were equally mistaken in their assessments of Plaintiff's medical needs, the doctor's competence to make such a judgment, even if mistaken, permits him to better withstand an Eighth Amendment challenge to his professional opinions.

tablished' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3039, 97 L.Ed.2d. 523 (1987); *see also Williams*, 186 F.3d at 691 n. 2 (criticizing as "too general" the formulation of the right at issue in that case as an inmate's right "to receive necessary psychiatric care").

As discussed earlier, if the Eighth Amendment claim against Rice rested solely upon her own assessments of Plaintiff's condition and her housing decisions based on these assessments, any error in these judgments would not sustain a claim of deliberate indifference. Rather, any constitutional violation that occurred was the result of Rice's election to forge ahead with these judgments, despite her acknowledged lack of medical expertise, without first seeking the views of a qualified medical professional regarding the appropriateness of single cell housing in light of Plaintiff's mental health condition and the changes in circumstances since Plaintiff was last evaluated by Dr. Hemachandra. Neither Plaintiff nor the Court's own research has identified a Supreme Court or Court of Appeals decision involving comparable facts, nor has Plaintiff otherwise shown that the unlawfulness of Rice's course of action should have been apparent in light of the existing case law.

Indeed, as discussed below, if Rice's conduct here were deemed clearly violative of existing law, one would expect to find different policies and practices in place at the Oakland County Jail and at similar facilities across the country. As acknowledged by one of Plaintiff's experts, the vast majority of county jails allow determinations about an inmate's suicidal tendencies to be made by employees who are not psychiatrists, but instead have merely been trained in suicide detection and prevention. Similarly, in this case, there is no evidence that Rice deviated from her usual practice in determining Plaintiff's cell assignments—rather, it is clear from her testimony that she routinely makes such decisions based on her own assessments, and without first consulting the inmate's treating physician or psychiatrist. Although Plaintiff's experts question whether a caseworker such as Rice, with suicide detection and prevention training but no advanced degree in psychiatry, should be allowed to make such determinations, Plaintiff has failed to demonstrate that it was clearly unlawful for her to do so at the time she made the cell assignment at issue here.

To be sure, if Oakland County's policies and practices on this subject did not pass constitutional muster, Rice's strict adherence to these practices would not preclude a finding that she violated Plaintiff's rights under the Eighth Amendment. For purposes of the Court's qualified immunity analysis, however, Rice should not be compelled to question the legality of her employer's policies, absent clearly established law that would have alerted her to such a defect. Because the Court has been unable to locate any such pre-existing law, Rice is entitled to qualified immunity.

### 3. Plaintiff's Eighth Amendment Claims Against the Oakland County Sheriff and Deputies

Plaintiff's Eighth Amendment claims against the remaining individual Defendants—Oakland County Sheriff Michael J. Bouchard and deputies Michael Monroe, Terry Montgomery, and John Jorganson—are much more easily resolved. Defendants argue that the claim against Sheriff Bouchard rests solely upon an impermissible theory of *respondeat superior*, and that the claims against the deputies fail for lack of evidence that they disregarded any

known risk faced by Plaintiff. The Court agrees.

■ Regarding Sheriff Bouchard, the complaint alleges only that he was the commanding officer of the Oakland County Sheriff's Department and the Defendant deputies, that he was responsible for ensuring that the County's deputies enforced and followed the law, and that he was in charge of the Oakland County Jail. As noted by Defendants, however, these supervisory allegations alone cannot sustain a § 1983 claim, absent allegations and evidence that Sheriff Bouchard himself engaged in "active unconstitutional behavior" by directly participating, encouraging, authorizing, or acquiescing in the allegedly offending conduct of a sheriff's deputy. *See Doe v. City of Roseville*, 296 F.3d 431, 439–40 (6th Cir.2002); *Comstock*, 273 F.3d at 712–13. In his response to the Oakland County Defendants' motion, Plaintiff does not even attempt to identify any evidence of such affirmative conduct by Sheriff Bouchard, but instead mentions him only along with the Defendant Oakland County as having adopted allegedly unconstitutional customs or practices for providing care to mentally ill inmates. This "official capacity" claim against the Sheriff, which is essentially a claim against the County itself, *see Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir.1989), does not provide a basis for individual liability against the Sheriff under § 1983.

■ Regarding Deputy John Jorganson, the record indicates that he placed Plaintiff in a single cell on November 18, 2002, following Plaintiff's difficulties with his fellow inmates in his existing 10–man cell assignment. This single cell, of course, was the one in which Plaintiff committed suicide four days later. In light of his history of prior suicide and behavior

watches, Plaintiff argues that "a jury could possibly decide that a reasonable person, in Deputy Jorganson's position, would have concluded that a substantial risk of serious harm to [Plaintiff] existed" by placing him in a single cell. (Plaintiff's Response Br. at 22.) Be that as it may, however, the "deliberate indifference" standard *requires* evidence that Deputy Jorganson *actually perceived* this risk. *See Farmer*, 511 U.S. at 837–38, 114 S.Ct. at 1979; *Comstock*, 273 F.3d at 703.

The evidentiary record not only fails to support this conclusion, but it essentially refutes it. In accordance with jail policy, which requires that any inmate who previously has been on watch status must be cleared for single cell housing, Deputy Jorganson sought the approval of inmate caseworker Roberta Rice before transferring Plaintiff from a 10–man to a single cell. Before placing Plaintiff in a single cell, Deputy Jorganson obtained clearance from Rice to make this transfer—specifically, as disclosed in her November 18, 2002 counseling notes, Rice concluded that Plaintiff could safely be placed in a single cell, and that no watch was necessary. In reliance on this determination, by the jail official expressly authorized to make housing and watch status decisions, Deputy Jorganson placed Plaintiff in a single cell. Plainly, then, Deputy Jorganson had no basis to believe that a single cell assignment posed a significant risk of harm to Plaintiff, where he had been assured by a presumably competent authority that there was no such risk.[15] And, there is no evidence whatsoever that, despite this assurance, Deputy Jorganson nonetheless perceived that a single cell assignment could jeopardize Plaintiff's health and well-being. Accordingly, Plaintiff cannot satisfy the

---

15. Indeed, even if Deputy Jorganson had reviewed Plaintiff's medical records, the most recent psychiatric assessment of Plaintiff by

Dr. Hemachandra would have confirmed Rice's determination that Plaintiff was not suicidal.

subjective prong of his Eighth Amendment "deliberate indifference" claim against Deputy Jorganson.

The claims against Deputies Monroe and Montgomery fail for similar reasons. Plaintiff's sole basis for seeking to impose liability on these Defendants is that they were on duty on Plaintiff's cell block when he committed suicide on November 22, 2002. Contrary to a jail policy calling for "clock rounds" to be conducted every 60 minutes, the Defendant deputies conducted clock rounds at 5:47 p.m. and 7:03 p.m., a 76–minute interval during which Plaintiff hung himself from a bed sheet in his cell. From these facts, Plaintiff maintains that "a jury could possibly decide that a reasonable person, in [the deputies'] position, would have concluded that a substantial risk of serious harm to [Plaintiff] existed." (Plaintiff's Response Br. at 22–23.) Once again, however, this objective standard, even if satisfied, does not address the subjective prong of the "deliberative indifference" inquiry—it is not enough, in other words, for Plaintiff "to demonstrate a question of fact whether the ... sheriff's deputies *should have* known" of a substantial risk faced by Plaintiff. *Watkins v. City of Battle Creek,* 273 F.3d 682, 686 (6th Cir.2001).

■ In fact, the record is utterly silent as to this issue of what Deputies Monroe and Montgomery subjectively perceived. Given that Plaintiff had been placed in a single cell and no special watch status had been ordered, there would have been no particular reason for these deputies to believe that it was necessary to watch Plaintiff any more closely than any other inmate. This being the case, there would have been no basis for these deputies to perceive that Plaintiff (or any other inmate on the cell block) faced a substantial risk of serious harm if they conducted their rounds 16 minutes further apart than mandated under jail policy. And, once again,

there is no evidence that Deputy Monroe or Deputy Montgomery actually drew the inference that their delayed rounds might threaten Plaintiff's health and well-being.

Indeed, if Plaintiff's theory of liability were accepted as to Deputies Jorganson, Monroe, and Montgomery, a jailer would always be chargeable with knowledge of a substantial risk of harm to an inmate, so long as the inmate had been placed on a special watch status at any point during his incarceration. Neither Plaintiff nor the Court's own research has uncovered any authority for this position. Plainly, an inmate's watch status can change from time to time, and prison guards presumptively are entitled to rely on the determination of a designated authority that such a change is based on sound medical or other professional judgment. Nothing in the record in this case would demand that the Defendant deputies second-guess Rice's decision that Plaintiff did not need a special cell assignment or watch status.

## C. Plaintiff's § 1983 Claim Against Defendant Oakland County

■ The sole remaining federal claim asserted by Plaintiff is a § 1983 claim against Defendant Oakland County. Under familiar principles, this governmental Defendant "cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory v. Shelby County,* 220 F.3d 433, 441 (6th Cir.2000) (citing *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)). Instead, "[f]or liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort." *Gregory,* 220 F.3d at 441. Moreover, Plaintiff must establish that "through its deliberate conduct, the [County] was the 'moving force' behind" the violation of his constitutional rights—that is, he "must

show that the [County's] action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the [County's] action and the deprivation of federal rights." *Gregory*, 220 F.3d at 442 (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 1389, 137 L.Ed.2d 626 (1997)).

Juxtaposing these and the relevant Eighth Amendment standards set forth earlier, Plaintiff must identify a Oakland County policy or custom that evidenced the County's deliberate indifference to the serious mental health needs of inmates confined at the County Jail. The initial portion of this inquiry, at least, follows from the Court's analysis to this point. First, it is clear that the County's liability must rest, if at all, upon the actions of Defendant Rice, because the Court already has concluded that only this Defendant could be found by a trier of fact to have violated Plaintiff's Eighth Amendment rights. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir.2001); *Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir.2000).

Next, it is evident from the Court's earlier discussion that the evidence forges the requisite causal link between Rice's actions and an Oakland County policy or practice. Plaintiff's theory on this point is that a County custom or practice caused his constitutional injury by allowing Rice, an individual without the appropriate mental health education and expertise, to make decisions that affected the care and treatment of a mentally ill inmate. Although the Oakland County Defendants characterize Rice's decisions regarding cell placement and watch status as administrative rather than medical in nature, Plaintiff and his expert, Dr. Emanuel Tanay, assert that a decision to place an inmate in a single cell can have implications to his mental health treatment, by creating an environ-

ment in which a mentally ill inmate can cause harm to himself. In addition, the Court already has noted the Oakland County Defendants' express acknowledgment that Rice made determinations as to Plaintiff's mental stability and suicidal tendencies that, viewing the record in a light most favorable to Plaintiff, could be deemed to lie within the province of a mental health professional.

Thus, while the Oakland County Defendants—and, apparently, the County's formal policies—attempt to draw a clear distinction between the administrative, non-medical determinations made by caseworkers such as Rice, and the medical assessments made by trained psychiatrists such as Dr. Hemachandra, Plaintiff has raised a substantial question whether the actual customs and practices employed by Rice and other caseworkers tend to blur this claimed distinction. As an example, Plaintiff cites the deposition testimony of Oakland County Jail administrator Ann Russell, who is responsible for drafting the jail's policies and procedures, and who characterized the role of an inmate caseworker as implementing the treatment plan developed by an inmate's psychiatrist. In this case, this presumably would mean that Rice was responsible for carrying out the treatment recommendations made by Dr. Hemachandra regarding psychiatric medications and counseling. Yet, despite the fact that Plaintiff had refused his medications and was not provided with counseling, Rice alone made the determination, without first consulting with Dr. Hemachandra, that Plaintiff was not suicidal and could be safely housed in a single cell.

Rice acknowledged at her deposition that her decisions on such matters of housing are final, at least as a practical matter, and that Dr. Hemachandra, for one, could not overrule her decisions. (*See* Plaintiff's Response, Ex. 24, Rice Dep. at 71.) In

addition, Rice consistently maintained throughout her deposition that her role in the decisions regarding Plaintiff's incarceration was wholly in keeping with the functions typically performed by the County's inmate caseworkers, and the Oakland County Defendants nowhere contend that Rice deviated from her proper role. This record, in the Court's view, raises genuine issues of fact as to whether, as a matter of Oakland County custom or practice, a jail official without sufficient medical background or expertise was authorized to make decisions affecting the health care needs of Plaintiff, an inmate with a significant mental health disorder.

There remains only the question whether the County acted "with the requisite degree of culpability," *Gregory*, 220 F.3d at 442, in establishing, or at least allowing, the challenged custom or practice. On this point, the "deliberate indifference" standard applies to the County and the individual Defendants alike. *See Gray v. City of Detroit*, 399 F.3d 612, 617–18 (6th Cir. 2005); *Barber v. City of Salem*, 953 F.2d 232, 238–40 (6th Cir.1992); *Crocker v. County of Macomb*, 285 F.Supp.2d 971, 977 (E.D.Mich.2003), *aff'd*, 119 Fed.Appx. 718 (6th Cir.2005). Under this standard, the County has "a duty . . . to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable," and to "take reasonable steps" to prevent an inmate's suicide "[w]here such a risk is clear." *Gray*, 399 F.3d at 618.

Nonetheless, "[d]eliberate indifference remains distinct from mere negligence," *Gray*, 399 F.3d at 618 n. 1, and the County is not liable under § 1983 if it negligently administers reasonable policies or if, in hindsight, a different practice might have decreased the risk of Plaintiff's suicide, *Gray*, 399 F.3d at 618 n. 1; *Crocker*, 285 F.Supp.2d at 977. Rather, " 'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal ac-

tor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410, 117 S.Ct. at 1391. Moreover, it is important to bear in mind that, in formulating policies and practices, local governments are constrained by such practical considerations as "the allocation of resources," including "time, personnel, and money." *Roberts v. City of Troy*, 773 F.2d 720, 725 (6th Cir.1985).

The record here, viewed in a light most favorable to Plaintiff, simply does not establish that the County acted with deliberate indifference in allowing inmate caseworkers such as Defendant Rice to make housing decisions that, on occasion at least, implicated the medical needs of County Jail inmates. Initially, the Court notes the absence of any evidence linking this practice to a suicide or suicide attempt by any other County Jail inmate. This strongly suggests a lack of foreseeability that the County's practice posed a significant risk of inmate suicides. *See Gray*, 399 F.3d at 619 (finding no deliberate indifference because, among other reasons, the plaintiff's decedent was the only individual who had committed suicide in a particular City of Detroit facility in the past 20 years); *Howard v. Calhoun County*, 148 F.Supp.2d 883, 891 (W.D.Mich.2001).

In addition, the Court already has noted the testimony of Plaintiff's expert that the challenged practice here is widespread, with the vast majority of county jails allowing employees who are not psychiatrists, but who have been trained in suicide detection and prevention, to make determinations whether inmates are suicidal or potentially suicidal. This surely would provide an adequate database from which Plaintiff and his experts could cull and demonstrate an obvious risk of harm posed by this widespread practice. Yet, the record is utterly silent as to whether any other inmate's suicide could be linked to

852

the use of such a practice at any of these facilities.

Instead, Plaintiff has offered only expert opinions that the County's practice is inadequate, poses a danger to inmates with severe mental illnesses, and should be changed to better integrate psychiatric professionals into inmate housing decisions. At best, however, this would permit the conclusion that the County acted negligently by adopting or permitting a practice that proved inadequate in this case. The case law uniformly holds that such evidence does not satisfy the "deliberate indifference" standard. *See Gray*, 399 F.3d at 618–19; *Molton v. City of Cleveland*, 839 F.2d 240, 246 (6th Cir.1988); *Roberts*, 773 F.2d at 725; *Crocker*, 285 F.Supp.2d at 977. Consequently, Oakland County is entitled to summary judgment in its favor on Plaintiff's federal § 1983 claim.[16]

## IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Oakland County Defendants' April 2, 2004 Motion for Summary Judgment is GRANTED as to the federal claims asserted by Plaintiff, and is otherwise DENIED WITHOUT PREJUDICE. IT IS FURTHER ORDERED that Defendant Dr. Sarath Hemachandra's March 31, 2004 Motion for Summary Judgment also is GRANTED as to the federal claims asserted against him by Plaintiff, and is otherwise DENIED WITHOUT PREJUDICE.

16. Defendants also address Plaintiff's state-law claims in their motions. The Court declines, however, to exercise supplemental jurisdiction over these remaining state-law claims, in light of the resolution of all claims over which the Court has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3).